489 F.2d 390
 6 ERC 1248, 4 Envtl. L. Rep. 20,204
 NATURAL RESOURCES DEFENSE COUNCIL, INC., Project on Clean
Air, Save America's Vital Environment, Inc., Janey
Weber and Susanne Allstrom, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 No. 72-2402.
 United States Court of Appeals, Fifth Circuit.
 Feb. 8, 1974.
 
 Richard E. Ayres, Washington, D. C., Ogden Doremus, Savannah, Ga., for petitioners.
 William D. Ruckelshaus, Administrator, Environmental Protection Agency, Kent Frizzell, Asst. Atty. Gen., Edmund E. Clark, John D. Helm, Henry J. Bourguignon, Attys. Appellate Div., Dept. of Justice, Washington, D.C., for respondent.
 Joe Resweber, County Atty., Harris County, Charles J. Wilson, Asst. County Atty., Houston, Tex., amicus curiae.
 Before WISDOM, DYER and INGRAHAM, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 The petitioners in this case are two non-profit corporations, Natural Resources Defense Council (NRDC) and Save America's Vital Environment (SAVE), and two individual citizens. They seek review of an other of the Administrator of the Environmental Protection Agency (EPA), approving the State of Georgia's plan for achieving the federal ambient air quality standards under the Clean Air Act Amendments of 1970.[1] Petitioners raise four objections to the Administrator's action on the Georgia Plan. These concern (1) a provision of that plan guaranteeing the confidentiality of secret trade information supplied to Georgia pollution control officials; (2) a provision allowing Georgia officials to grant variances from particular requirements of the plan; (3) Georgia's adoption of a 'control strategy' allowing 'sources' of sulfur dioxide and particulate matter emissions, e.g. manufacturing plants, to avoid the necessity of installing emission reduction equipment by increasing the height of their smokestacks; and (4) provisions of the Plan directing Georgia officials to take into account economic impact and technological feasibility in the discharge of their duties under the state's air pollution control statutes. We conclude that in approving each of the challenged provisions of the Georgia Plan, the Administrator exceeded his authority under the Clean Air Act Amendments, and order him to take appropriate corrective action.
 
 
 2
 We begin with a necessary discussion of the provisions of the Clean Air Act Amendments of 1970 relevant to the issues in this case.
 
 I.
 
 3
 The Clean Air Act Amendments of 1970 establish a program for controlling air pollution that involves two phases of standard-setting. The first phase is the setting of what the Amendments call 'ambient air quality standards'. These are standards designating the maximum tolerable concentrations in the ambient air of substances identifiable as pollutants. The second is the establishment of specific controls enforceable against individual sources of emissions, designed to limit the permissible quantities of matter emitted into the air, or to control the timing, rate, or manner of emissions.[2] The changes in the ambient levels of pollutant concentrations by these various enforceable controls are calculated largely through a technique known as diffusion modelling.[3] In this way, the emission standards and other 'second phase' controls are derived from the ambient standards.
 
 
 4
 The Amendments divide responsibility for the establishment of these two sets of standards between the states and the federal government. The EPA has exclusive responsibility for establishing national ambient standards, while the states have primary authority, subject to EPA review, for establishing their own 'implementation plans' to achieve those standards. The federal authority for promulgating ambient standards is established by 42 U.S.C. 1857c-4(a). That provision requires the Administrator of the EPA to promulgate ambient air quality standards for all so-called 'criteria pollutants' within 120 days from the enactment of the Amendments.[4] The Administrator is to establish two sets of ambient standards for each pollutant: 'Primary' standards, 'the attainment and maintenance of which . . . are requisite to protect the public health', 42 U.S.C. 1857c-4(b)(1); and 'secondary' standards 'requisite to protect the public welfare from any known or anticipated adverse effects'.[5] 42 U.S.C. 1857c-4(b)(2).
 
 
 5
 The provision governing the adoption by the states and approval by the EPA of the state implementation plans is 42 U.S.C. 1857c-5; and this long and detailed provision is the focus of our concern in this case. Under 1857c-5, the states must prepare and submit implementation plans within nine months of the promulgation of the national ambient standards.[6] The Administrator then reviews the state plans to assure that they meet requirements established by the statute. The basic requirements are that the plans guarantee (1) the attainment of the national primary standards 'as expeditiously as practicable', but in no case later than three years after the date of the approval of the plan,[7] and (2) and attainment of the secondary standards within a 'reasonable time' to be specified by each plan.[8] Each plan must include 'emission limitations, schedules, timetables for compliance with the limitations, and such other measures as may be necessary to insure attainment and maintenance' of the national standards.[9] Beyond these basic requirements, the provisions of 1857c-5(a)(2)(C)-(H) set forth a number of other specific conditions a plan must meet before the Administrator may approve it. For instance, the plan must provide for monitoring and analyzing data on ambient air quality;[10] it must assure the funding and staffing of state agencies responsible for carrying out the plan;[11] and it must provide for periodic reports on the nature and quantity of emissions, and for making such reports public.[12] If the Administrator finds that a plan meets all of the statutory conditions, he must approve the plan within four months of the date of its submission.[13] If, on the other hand, he finds a plan or any portion of a plan does not satisfy any of the statutory conditions, he must disapprove that plan or portion. He is then directed to prepare and publish 'promptly' his own implementation plan, or portion of a plan, for the state involved.[14] The Administrator must publish his substitute regulations within six months of the date required for submission of the implementation plan in question.[15]
 
 
 6
 Subsections (e) and (f) of section 1857c-5 allow the Administrator to relax, in sharply limited circumstances, the requirements of section 1857c-5 or of any implementation plan promulgated under it. Subsection (e) allows the Administrator to extend the three-year deadline for meeting the national primary standards for up to two years, at the time the plan is submitted for approval. The Governor of the state involved must request the extension, and the Administrator must determine that the techology necessary to attain the standards is not then available, and that the state has taken or is planning to take all reasonably available control measures.[16] Subsection (f) provides a procedure for allowing particular sources to postpone the effective date of any requirement of any state plan after the plan has become effective. It requires that the Governor petition the Administrator for the postponement, and sets forth in detail the standards to be applied and procedures to be followed when petitions for posteponements are brought.[17] Postponements may be granted for up to one year.
 
 
 7
 The Clean Air Act Amendments were enacted on December 31, 1970. Exactly 120 days later, on April 30, 1971, the EPA promulgated the national ambient standards for the six categories of 'criteria pollutants'.[18] See 40 C.F.R. 50 (1972). On August 14, 1971, the Administrator adopted regulations to guide the states in the formulation and submission of their implementations plans. Requirements for the Preparation, Adoption and Submittal of Implementation Plans, 40 C.F.R. 51 (1972). Implementation plans were due nine months from the date of the promulgation of the ambient standards, on January 31, 1972. Forty states met the deadline; the other states all filed their plans within a short time thereafter. The Administrator announced his actions on the various plans May 31, 1972. 37 Fed.Reg. 10842 et seq.
 
 
 8
 Georgia was one of the forty states to meet the January 31, 1972, deadline. The Administrator announced his action on the Georgia Plan in the regulations published May 31, 1972. The Administrator disapproved the plan in two respects not material here and approved all other portions of the Plan. 37 Fed.Reg. 10859, promulgating 40 C.F.R. 52.572-4. The petitioners docketed this petition for review, under 42 U.S.C. 1857h-5(b), within the 30-day period that provision allows.[19]
 
 II.
 
 9
 The petitioners' first objection concerns a Georgia statute requiring the agencies responsible for Georgia's air quality program to keep confidential 'any information' they obtain relating to 'secret processed, devices, or methods of manufacture or production'.[20] Ga.Code Ann. 88-908 (1971). The petitioners contend that the Administrator's approval of this provision was prohibited by 42 U.S.C. 1857c-5(a)(2)(F)(iii), (iv). Those two clauses require that the state implementation plan provide 'for periodic reports on the nature and amounts of (stationary source) emissions' from all sources covered by the plan, and 'that such reports shall be correlated by the State agency with any emission limitations or standards established pursuant to this Act, which reports shall be available . . . for public inspection'.[21] The petitioners contend that Georgia's section 88-908 should have been disapproved because that statute, with its blanket protection of 'any information' relating to trade secrets, would direct Georgia officials to block public access to emission data where such data could qualify as 'trade secret' information, and that this violates section 1857c-5(a)(2)(F)(iii), (iv).
 
 
 10
 We agree. The public information and disclosure requirements of section 1857c-5(a)(2)(F)(iii), (iv) have an important function under the 1970 Amendments. The Amendments embraced the concept of 'citizen enforcement' of antipollution laws. 42 U.S.C. 1857h-2 permits 'any person' to bring a civil action in the federal district courts to enforce compliance with 'any emission standard or limitation' promulgated under the Clean Air Act.[22] The public information requirements play a crucial role in assuring effective citizen enforcement. They are designed to ensure that 'citizen enforcers' will have access to any and all information they will need in prosecuting enforcement suits or in deciding whether to bring them.[23]
 
 
 11
 Georgia's section 88-908 would hamper the operation of the public information and disclosure requirements in Georgia. The statute directs officials to ignore their duty under the federal statute to assure the disclosure of all emission data if some emission data touches upon trade secrets. And the dictates of section 88-908 may be stern indeed, for a separate provision of the Georgia air pollution code threatens criminal penalties to an official who violates section 88-908.[24] In addition, section 88-908 could invite private parties to litigate questions whether emission data is 'information relating to secret processes, devices, or methods of manufacture or production', and could thereby further impede the prompt and full disclosure of emission data.
 
 
 12
 In holding as we do, we are not insensitive to private interests in protecting confidential trade information. We view that interest, however, as subordinate to the public interest in full disclosure of emission data. This was the balance Congress itself struck in the 1970 Amendments. The Amendments provide for the confidentiality of trade secrets contained in information supplied to federal officials, but expressly state that emission data is not entitled to trade secret protection. See 42 U.S.C. 1857c-9(c). The statute is not similarly explicit where information supplied to state officials is concerned, but there is no reason to strike the balance differently in that context.
 
 
 13
 The Administrator has himself disapproved provisions in fourteen state plans virtually indistinguishable from the provision in question here.[25] The EPA has presented no persuasive reason for distinguishing the situation here from the fourteen other situations in which the Administrator disapproved overinclusive confidentiality provisions.[26] We hold that this provision, like the fourteen others, violated section 1857c-5(a)(2)(F)(iii), (iv), and should have been disapproved.
 
 
 14
 Accordingly, we order the Administrator to publish forthwith his disapproval of section 88-908.
 
 III.
 
 15
 The second objection the prtitioners raise concerns a Georgia statute authorizing Georgia officials to grant variances from requirements of the implementation plan. Ga.Code Ann. 88-912 empowers the Georgia Department of Public Health to grant variances from 'the particular requirements of any rule, regulation or general order' in a number of circumstances: if the Department finds that 'strict compliance . . . is inappropriate because of conditions beyond the control of the . . . persons . . . granted such variances'; if it finds 'special circumstances which would render strict compliance unreasonable, unduly burdensome, or impractical'; if it finds that 'strict compliance would result in substantial curtailment or closing down of . . . businesses, plants or operations'. The statute specifies the procedures to be followed when variances are granted. A party seeking a variance must file a petition with the Director of the Department of Public Health, who makes an initial recommendation on the disposition of the petition. If his recommendation is against granting the variance, the Department must afford the party seeking the variance a hearing; if it is in favor of granting the variance, the Department must afford a hearing to any party aggrieved by the variance.[27]
 
 
 16
 The petitioners' principal objection to this provision[28] is that it circumvents the provisions of 42 U.S.C. 1857c-5(f), which, the petitioners argue, Congress intended to be the exclusive mechanism for granting bariances from requirements of state implementation plans. Section 1857c-5(f) speaks in terms of 'postponements' of the effective dates of the requirements of implementation plans. It provides that 'prior to the date on which any stationary source . . . is required to comply with any requirement of an applicable implementation plan', the Administrator may grant a postponement for no more than one year of the effective date of the requirement. Section 1857c-5(f) requires that the Governor of the state apply to the Administrator for such a postponement. The substantive conditions of granting a section 1857c-5(f) postponement are strict. The Administrator must determine that 'good faith efforts have been made to comply with such requirement'; that the source 'is unable to comply . . . because the necessary technology or other alternative methods of control are not available or have not been available for a sufficient period of time'; that 'any available alternative operating procedures and interim control measures have reduced or will reduce the impact of such source on public health'; and that 'the continued operation of such source is essential to national security or to the public health or welfare'. 42 U.S.C. 1857c-5(f)(1)(A)-(D). The section imposes procedural requirements for the granting of a postponement: affected parties must be afforded and opportunity to be heard; the Administrator must make a statement of his findings and conclusions; and judicial review is provided in the appropriate circuit courts of appeals.[29]
 
 
 17
 The standards and procedures of section 1857c-5(f) are far more restrictive than the counterpart standards and procedures of Georgia's section 88-912. The petitioners argue that the restrictiveness of section 1857c-5(f) was deliberate on the part of Congress and that the section was intended to apply to all requests to change the application of particular requirements of state implementation plans after the adoption of the plans. They contend therefore that the Georgia provision is an impermissible attempt to frustrate the will of Congress.
 
 
 18
 The EPA takes a different view of section 1857c-5(f). The Agency argues that the standards and procedures of that section are intended to apply only when the source in question is so large or has such serious effects that granting a postponement to that individual source will, by itself, threaten the attainment of a national ambient air standard. In other situations, the EPA argues, the states have power to grant variances under section 1857c-5(a)(3), which provides for 'revisions' by the states of their implementation plans, subject to EPA review to determine whether the plan as revised still meets all the requirements of the statute.[30] The Administrator's theory is that each time a state grants in individual variance not sufficient to threaten attainment or maintenance of a national standard, it is merely 'revising' its implementation plan. The Administrator has embodied this view of section 1857c-5(f) and of the 'revision' authority of section 1857c-5(a)(3) in his Guidelines for the Preparation, Adoption, and Submittal of Implementation Plans. See 40 C.F.R. 51.15(d), -.32 (1972).[31]
 
 
 19
 We cannot accept the Administrator's reading of the statute. Nothing in the statute supports the limitation of section 1857c-5(f) to situations involving sources so large that a single variance granted it threatens the attainment of a national ambient standard. Section 1857c-5(f) speaks in terms of 'any stationary source', and of the postponement of 'any requirement of an applicable implementation plan'. This language is not ambiguous and lends no basis for the construction the Administrator has given it. Nor does the revision authority of section 1857c-5(a)(3) lend any aid to the Agency's argument. A revision is a change in a generally applicable requirement; a postponement or variance; a change in the application of a requirement to a particular party. The distinction between the two is familiar and clear. It is equally clear that it was this distinction Congress had in mind when it simultaneously adopted section 1857c-5(f) and section 1857c-5(a)(3)-- the procedures of section 1857c-5(f) were to apply to all particular changes, and those of section 1857c-5(a)(3) to changes in rules of general application. There is no reason to believe that Congress intended that some, indeed most, changes of a particular character should be deemed revisions' for the purposes of choosing a procedure for approving it.
 
 
 20
 Our conclusion is fortified by our view of the overall scheme of the Clean Air Act Amendments. The approach of the Amendments, as one commentator has expressed it, was to shift from the approach of earlier legislation of 'establishing air pollution standards commensurate with existing technological feasibility' to a bolder 'policy which forces technology to catch up with the newly promulgated standards'. Note, The Clean Air Amendments of 1970: Better Automotive Ideas from Congress, 12 B.C.Ind. & Comm.L.Rev. 571, 581 (1971). As Senator Muskie, the Senate sponsor of the Amendments, put it:
 
 
 21
 The first responsibility of Congress is not the making of technological or economic judgments-- or even to be limited by what is or appears to be technologically or economically feasible. Our responsibility is to establish what the public interest requires to protect the health of persons. This may mean that people and industries will be asked to do what seems to be impossible at the present time. But if health is to be protected, these challenges must be met.
 
 
 22
 116 Cong.Rec. 16091 (daily ed. Sept. 21, 1970), quoted at Note, supra, at 581. In a statute that constituted a 'challenge to do what seem(ed) impossible', seeking to 'force technology to catch up with the newly promulgated standards', it was essential to include a device to ensure that ambitious commitments made at the planning stage could not readily be abandoned when the time came to meet those commitments, and to assume the costs and burdens they entailed.
 
 
 23
 Section 1857c-5(f) is the device Congress chose to assure this. Congress aimed to make 'variances', 'postponements', or whatever departures from earlier commitments might be called, unusual and difficult to obtain. That is why Congress required applications for them to be made by the governors of the states, thus ensuring an initial screening of applications by highlevel state officials. And that is why Congress imposed rigorous substantive conditions on the granting of variances, allowing them only when the unavailability of technology made compliance impossible, when continued operation of the source was essential to national security, public health, or public welfare, and when all available alternative control measures had been taken. Georgia's statute, allowing variances whenever a state official finds compliance would be 'unduly burdensome', 'unreasonable', or 'inappropriate', or when he finds that compliance would require the closing of any source-- whether or not the source is necessary to the public health or welfare or to national security-- would be wholly inadequate to fulfill the part Congress planned for the federal postponement provision, section 1857c-5(f), to play in the general strategy of the Clean Air Act Amendments.
 
 
 24
 The EPA advances an alternative to the theory based on the 'revision' authority of section 1857c-5(a)(3) as a ground on which it suggsts we may uphold, at least in part, the Administrator's approval of section 88-912. The EPA suggests that, even if we hold that the state variance procedure is impermissible in the period after the date set for the initial attainment of the national ambient air standards (in mid-1975, for the primary standards), we might still approve the use of state variance procedures during the period preceding these dates. This suggestion derives from the decision of the First Circuit in a case involving a challenge, also mounted by the Natural Resources Defense Council, to the Administrator's approval of the Massachusetts and Rhode Island state plans. Natural Resources Defense Council v. EPA, 1 Cir. 1973, 478 F.2d 875.[32]
 
 
 25
 In that case, the Administrator had approved variance provisions in both the Massachusetts and Rhode Island plans very much like the variance provision included in the Georgia Plan. In response to the NRDC's challenge to both states' provisions, 478 F.2d at 884-888, 891, the First Circuit held that state variance procedures could not be employed during what it labelled the 'post-attainment period', because it concluded that Congress intended that section 1857c-5(f) should provide the exclusive mechanism for altering the application of requirements of implementation plans over the long run, 478 F.2d at 887, espressly rejecting the theory based on the 'revision' authority of section 1857c-5(a)(3). But the court allowed the use of state variance procedures during what it called the 'pre-attainment period'. Its rationale for this holding was its conclusion that the statute 'anticipates greater flexibility during the pre-attainment period'. It said:
 
 
 26
 We can value in permitting a state to impose strict emission limitations now, subject to individual exemptions if practicability warrants; otherwise it may be forced to adopt less stringent limitations in order to accommodate those who, notwithstanding reasonable efforts, are as yet unable to comply.
 
 
 27
 478 F.2d at 887.
 
 
 28
 We are unable to agree that the statute envisions granting the states the kind of 'flexibility' during the 'pre-attainment period' which provisions like Georgia's section 88-912 would afford. The parts of the statute on which the First Circuit relied were the provision of section 1857c-5(a)(2)(A)(i) that primary standards had to be met, not immediately, but only 'as expeditiously as practicable', but in no case later than three years from the adoption of the state plan, and the provision of section 1857c-5(e) for a possible two-year extension of the deadline in sharply restricted circumstances. The First Circuit said that 'the provision for a three-year grace period, followed by the possibility of a further two-year extension, indicates that Congress did not expect immediate achievement of standards'. 478 F.2d at 887.
 
 
 29
 This statement, however, contains a crucial ambiguity, and it supports the First Circuit's holding only if that ambiguity is overlooked. It is of course true that the provision of a three-year grace period, and of the possibility, however limited, of an extension, do mean that Congress did not expect immediate achievement of ambient standards. But it does not follow that Congress did not contemplate that emission standards would not have to be met 'immediately' as their scheduled dates-- set by the implementation plan-- arrived. We think that the provisions of section 1857c-5(a)(2)(A)(i) and section 1857c-5(e) do not provide any support for the latter conclusion. Nor do we find any support for that conclusion anywhere in the statute. Instead we find that the statute as a whole supports the general view of its overall strategy we articulated above: that the plan of the statute was to secure ambitious commitments at the planning stage, and then, by making it difficult to depart from those commitments, to assure that departures would be made only in cases of real need. That view precludes the conclusion that Congress intended the states to have the kind of 'flexibility' state variance plans would give them.
 
 
 30
 Thus we hold that it was inconsistent with the statute for Georgia to adopt its own variance procedures, and that the Administrator exceeded his authority in approving section 88-912. Accordingly, we direct the Administrator to publish forthwith his disapproval of section 88-912.
 
 IV.
 
 31
 The third objection the petitioners raise concerns Georgia's 'control strategy' for meeting the national ambient air quality standards for particulate matter and sulfur dioxide.[33] Georgia's implementation plan, as submitted to the Administrator and approved by him in May 1972, made the permissible amounts of particulates and sulfur dioxide emissions dependent on the heights of the smokestacks at the sources; the higher its smokestacks, the more a source was permitted to emit. Georgia Rules and Regulations for Air Quality Control 270-5-24-.02(2)(g) (SO(2)), -(m) (particulates). This 'tall stack' approach represents a form of 'dispersion enhancement technique'. Dispersion enhancement techniques are techniques to reduce concentrations of pollutants not by reducing the quantities emitted into the air-- the objective of so-called 'emission limitation' techniques-- but rather by altering the conditions under which substances are emitted, in order to enhance their dispersion throughout the atmosphere.[34]
 
 
 32
 The petitioners contend that Georgia's choice of such a strategy is in conflict with 42 U.S.C. 1857c-5(a)(2)(B). That subparagraph requires that state implementation plans 'include emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard'. The petitioners contend that the directive to use 'emission limitations', coupled with the reference to 'other measures . . . necessary', means that 'other measures', including any and all dispersion techniques,[35] may be employed only when 'necessary' in the sense that all available emission limitation has been first achieved. And they suggest that Georgia had not adopted controls capable of achieving the maximum possible emission limitation before it adopted the tall stack controls.
 
 
 33
 The Agency raises a threshold issue, however, which we must decide before we may consider the merits of this objection. During oral argument in this case, on May 9, 1973, counsel for the EPA informed the Court that two days earlier the Agency had advised Georgia that it no longer considered the regulations setting forth the tall stack controls 'valid control techniques' under section 1857c-5(a)(2)(B). The Agency argued that this action mooted the petitioners' third objection. After argument, the EPA filed with this Court a copy of the letter by which the Agency had informed Georgia of its decision. This is a letter, dated May 7, 1973, from Mr. Jack E. Rayan, the EPA Regional Administrator, to Governor Jimmy Carter of Georgia.
 
 
 34
 We thus first address the question whether the action announced in the May 7 letter to Governor Carter moots the issue otherwise before the Court.
 
 A.
 
 35
 The relevant portion of the EPA's letter to Governor Carter is this:
 
 
 36
 On May 31, 1972, the Administrator of the Environmental Protection Agency approved the Georgia Implementation Plan control strategy for attainment of the National Standards for particulates and sulfur dioxide. Further analysis by the Environmental Potection Agency has shown that the control strategy for attainment and maintenance of standards allows the application of regulations (GA.Regs. 270-5-24-.02-(2)-(g) and 270-5-24-.02(2)-(m) which permit unrestricted increases in stack height through(out) the State as a means of compliance. It is the determination of the Environmental Protection Agency that these regulations are not valid control techniques under Section (1857c-5(a)(2)(B)) of the Clean Air Act.
 
 
 37
 Therefore, as required by Section (1857c-5(a)(2)(H)(ii)) of the Clean Air Act, Georgia must revise its Plan by deleting the above cited regulations and submitting a substitute control strategy.
 
 
 38
 The petitioners argue that the action announced in this letter fails to moot their third objection, because that action stops short of rejecting altogether Georgia's dispersion enhancement control strategy. They focus upon the passage we italicized in the letter. They point out that in the letter the EPA merely disapproved the particular regulations Georgia adopted, and not the entire idea of a dispersion enhancement control strategy. And they note that the vice of the regulations identified by the letter is not that the strategy they embody relies upon tall stacks, or that it relies upon dispersion enhancement, but merely that the regulations permitted unrestricted increases in stack height throughout the state. Thus, they argue, their dispute with the EPA over whether Georgia may employ a tall stack strategy is still a live one.
 
 
 39
 We agree. It has become manifest since the letter was sent to Governor Carter, that the EPA's objection to Georgia's regulations was not to their fundamental approach, but merely to their excessive breadth. The EPA on September 14, 1973, published proposed amendments to its Guidelines on the Preparation, Adoption and Submittal of Implementation Plans. These amendments include a proposed regulation to govern the use of tall stacks for controlling sulfur dioxide and particulate matter pollution. 38 Fed.Reg. 25701, proposing 40 C.F.R. 51.13(h). This regulation would generally allow the use of stack height increases to control pollution only up to 'heights consistent with good engineering practice'. However, large, isolated pollution sources would be allowed to undertake larger increases, provided that at the same time they were subjected to a more general set of dispersion-enhancing controls.[36]
 
 
 40
 This proposal makes it clear that the EPA's objection to Georgia's regulation is what the petitioners argue it to be: that the regulations permit unrestricted increases anywhere in the state, and not that they rely upon a dispersion control strategy. The regulations permit the use of stack height increases up to the point consistent with good engineering practice as a control strategy. And they permit the use of unrestricted stack height increases in prescribed circumstances for large, isolated sources. They do not reject the idea of a tall stack control strategy; and they certainly do not reject the more general idea of a dispersion enhancement strategy. Implicit in the Agency's statement that the regulations are faulty because they 'permit unrestricted stack height increases through(out) the state' is the message that the Agency would approve a more limited use of a tall stack strategy; and the proposed regulations make it clearer that this was and is the Agency's position. Thus, the EPA's position is still considerably at odds with the position taken by the petitioners.
 
 
 41
 An additional consideration leads us to decide the mootness question as we do. This is the need for expedition in finally settling on a control strategy for Georgia for combatting sulfur dioxide and particulate matter pollution. Months have elapsed since the EPA first notified Georgia of the withdrawal of approval of the tall stack regulations. Neither Georgia nor the Administrator has come forward with a proposed alternative to the tall stack regulations.[37] Georgia does have other regulations aimed at controlling sulfur dioxide and particulate emissions,[38] but the EPA has not argued here that these regulations are by themselves sufficient to assure attainment of the national ambient standards for particulates and sulfur dioxide.[39] Over half of the three year period allowed for the attainment of the primary standards has elapsed; and we see little to be gained by waiting further to see whether the Administrator will approve a substitute for the Georgia regulations disapproved last May.
 
 B.
 42 U.S.C. 1857c-5(a)(2)(B) provides:
 
 42
 The Administrator shall approve such (state implementation) plan, or any portion thereof, if he determines that . . .
 
 
 43
 . . . .tra
 
 
 44
 (B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls.
 
 
 45
 The issue before this Court, in interpreting this provision, is well framed in an EPA staff paper, now published in the Congressional Record. In framing the issue, we take the liberty of quoting at length from that paper:
 
 
 46
 It should be clear . . . that the intent of Congress in the Clean Air Act is that the State Implementation Plans must include emission limitations. It is also clear that the words 'and such other measures as may be necessary' exclude the interpretation that emission reduction is the only acceptable means of meeting (national ambient air quality standards). Between these two boundaries to interpretation there is a broad, unexplored territory.
 
 
 47
 . . . .hat
 
 
 48
 There are two basic approaches to this legally unexplored territory. The first approach, which may be aclled the broad approach, views the (Act) in its entirety . . .. When (section 1857c-5(a)(2)(B)) is read in . . . light (of other provisions of the Act) emission reduction is clearly the preferred control method, and 'such other measures' are allowed only if emission reduction sufficient to meet (the national standards) in the time specified (3 years) is unavailable or infeasible-- or, in the words of the Act, only if they are 'necessary.'
 
 
 49
 The second interpretation, which may be called the narrow approach, focuses on the objective of (section 1857c-5(a)(2)(B)) rather than the means of attaining that objective. The principal objective of (a state implementation plan) is that it meet primary and secondary atandards by the appropriate deadline. Several means have been suggested, including emission limitation, land use, and transportation controls, but Congress was careful to add 'such other measures' and 'but not limited to.' Thus, any means may be employed provided the ends are attained.
 
 
 50
 Monitoring and Data Analysis Division, Office of Air Quality Planning and Standards, Office of Air and Water Pollution, Environmental Protection Agency, Staff Paper-- Intermittent Control Systems, 119 Cong.Rec. 10948, 10955-56 (daily ed. June 12, 1973).
 
 
 51
 We take the 'broad approach' described in the quoted passage. We believe that approach reflects the intent of Congress in adopting section 1857c-5(a)(2)(B). Two major considerations underlie our conclusion.
 
 
 52
 First, we find that other provisions of the 1970 Amendments indicate that Congress intended in section 1857c-5(a)(2)(B) to require maximum use of emission standards. Some sections show a general preference on the part of Congress for emission standards; others show an understanding by Congress that the requirements of implementation plans would consist primarily of emission standards.
 
 
 53
 The sections exhibiting Congress's preference for emission standards are sections 1857c-6(a)(1) and 1857c-7(b)(1)(B). Those sections provide, respectively, for the establishment of federal emission standards for new sources (section 1857c-6(a)(1)) and for emissions of hazardous air pollutants (section 1857c-7(b)(1)(B)).[40] Both sections make clear that the Administrator is to establish emission standards; they do not contemplate control of pollution from new sources or of hazardous pollutants by dispersion techniques, or by any other techniques besides emission limitation. See also EPA Staff Paper, supra, 119 Cong.Rec. at 10955 (daily ed. June 12, 1973).
 
 
 54
 Sections 1857c-6(d)(1) and 1857h-2(a)(1) exhibit a congressional understanding that implementation plans would generally rely upon emission limitations. Section 1857c-6(d)(1) requires the states to promulgate supplementary implementation plans establishing standards for the emissions from existing sources of 'non-criteria pollutants' when emissions of those substances from new sources are regulated by federal standards adopted upder section 1857c-6(a)-(b). It states that emission standards are to be established, and it says they shall be established by 'a procedure similar to that provided by section 1857c-5'. The EPA's staff paper aptly states why this implies emission standards are required under section 1857c-5(a)(2)(B):
 
 
 55
 This section requires emission standards for existing sources of noncriteria pollutants established 'by a procedure similar to that provided under (section 1857c-5).' This clearly implies that emission standards are required under Section (1857c-5). This implication is made not only by the plain language of the Act, but also on equity grounds. Why should emission standards be required of existing sources of non-criteria pollutants when such emission standards are not required for criteria pollutants? When Section (1857c-5(a)(B)) is read in this light, emission reduction is clearly the preferred control method, and 'such other measures' are allowed only if emission reduction sufficient to (the national standards) in the time specified (3 years) is unavailable or infeasible-- or, in the words of the Act, only if they are 'necessary'.
 
 
 56
 EPA Staff Paper, supra, 119 Cong.Rec. at 10955-56.
 
 
 57
 But the provision we think most important to note in this context is Section 1857h-2(a)(1), the citizen enforcement provision. That paragraph provides:
 
 
 58
 (a) Except as provided in subsection (b), any person may commence a civil action in his own behalf--
 
 
 59
 (1) against any person . . . who is alleged to be in violation of (A) an emission standard or limitation under this act or (B) an order issued by the Administrator or a State with respect to such standard or limitation.
 
 
 60
 We find in this section powerful evidence that Congress intended that the requirements of implementation plans would whenever possible be emission limitations. If, as the 'narrow approach' implies, the states may treat emission limitation and dispersion enhancement simply as alternative 'means' of attaining the 'objective' of meeting the national standards, then the states, with EPA approval, may choose requirements citizen enforcers are not empowered to enforce over requirements they would be empowered to enforce. We cannot believe Congress intended such a result. Citizen enforcers were supposed to be the watchdogs of the public enforcers, the EPA and the states. We cannot believe Congress would have afforded the states and the EPA an means by which they could unilaterally curtail the scope of their watchdogs' surveillance. This provision, too, evinces a congressional understanding that section 1857c-5(a)(2)(B) requires maximum use of emission standards and limitations.
 
 
 61
 The second consideration supporting our view of Congress's intent is the Clean Air Act's so-called policy of 'nondegradation'. This policy holds that areas of clean air-- areas where the air quality indices read above the levels set by the national standards-- must not be degraded, even though degradation will not reduce the quality of the air below the levels specified by the standards. The Act does not anywhere expressly adopt a nondegradation policy; but there is abundant evidence that nondegradation is an important goal of the Act. That evidence has been marshalled elsewhere. Sierra Club v. Ruckelshaus, D.C.D.C.1972, 344 F.Supp. 253, 255. We need do no more here than gather it in the margins.[41] By now the most important authority recognizing nondegradation as a policy of the Act is the Sierra Club decision, affirmed by an equally divided Supreme Court. See Fri v. Sierra Club, 1973,412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140.
 
 
 62
 The use of dispersion techniques is at odds with the nondegradation policy. Dispersion enhancement techniques operate by keeping pollutants out of areas of high pollutant concentration, and dispersing them to lower concentration areas; their objective is to reduce concentrations in high-concentration areas. Inevitably, however, the pollutants emitted into the atmosphere must end up somewhere; and the atmosphere at their destination, wherever that may be, will be degraded, in violation of the congressional policy. The only techniques fully capable of guaranteeing nondegradation are emission limitation techniques.
 
 
 63
 Our conclusion as to the Congressional objective in enacting section 1857c-5(a)(2)(B) draws further support from two items in the legislative history of the Amendments. The first and most important is that Congress chose the language of this section over language that would clearly have allowed alternatives to emission limitations to be used. The Administration and House bills in 1970 allowed the approval of a state plan if it included 'emission standards, or equivalent measures, and such other measures as may be necessary to achieving or preserving' the national standards. S. 3466, 7(c)(1)(C)(i). The second is a statement by Senator Muskie during the debates on the Amendments:
 
 
 64
 In order to implement the national ambient air quality standards, these (state implementation) plans must provide for emission limitations on all sources in the region covered by the plan . . .
 
 
 65
 116 Cong.Rec. 42384 (Dec. 18, 1970).
 
 
 66
 Our conclusion that the 'broad approach' to section 1857c-5(a)(2)(B) accurately reflects the statutory intent does not end the question, however. For the EPA's defense of Georgia's 'tall stack' strategy does not rest entirely, or even primarily, on the so-called 'narrow approach'. It rests, instead, upon the fact the Georgia has regulations apart from the 'tall stack' regulations which impose limits on the emissions of sulfur dioxide and particulate matter. Responding to this argument requires that we first discuss briefly what the regulations on which the EPA relies provide.
 
 C.
 
 67
 As submitted to the Administrator in 1972, the Georgia Rules and Regulations for Air Quality Control stipulated three separate quantitative limitations on emissions of particulate matter. One quantitative limit applied only to manufacturing sources;[42] a second applied only to fuel-burning sources.[43] The third limit, applicable to all sources, was expressed as a function of stack height; the regulation containing this limit was one of the two disapproved by the EPA in May 1973.[44] The two limits were cumulative, so that the effective limit for any given source was the lower of the two limitations applicable to it.[45]
 
 
 68
 The Georgia Regulations imposed only one express quantitative limit on the permissible level of sulfur dioxide emissions; this was the limitation, now disapproved, expressed in terms of stack height.[46] But Georgia also had a regulation, still effective today, limiting the permissible sulfur content of the fuel fuel-burning sources may use.[47] The aim and effect of this provision was to limit sulfur dioxide emissions; so the regulation is an 'emission limitation', in the broad sense of the term.[48] Since fuel-burning sources are virtually the only sources of sulfur dioxide emissions in Georgia,[49] Georgia does have an 'emission limiting' regulation applicable to every source of sulfur dioxide in the state.
 
 
 69
 The EPA's primary argument rests upon the limitations on sulfur dioxide and particulate emissions that are not related to stack height. The EPA notes (1) that the Georgia Plan, as initially approved, contained an 'emission limiting' regulation applicable to every source in the state; and (2) that the Plan as approved guaranteed attainment and maintenance of the national ambient standards for particulates and sulfur dioxide. This, the EPA argues, should be sufficient to satisfy any requirement that plans include 'emission limitations' section 1857c-5(a)(2)(B) may impose.
 
 
 70
 The EPA's argument mistakes the nature of the 'broad approach' to section 1857c-5(a)(2)(B). That provision is not satisfied merely because a state plan includes a stated emission limitation applicable to every source in the state, and also, with the help of dispersion techniques, quarantees attainment of the national standards.[50] The 'broad approach'-- as expressed by the EPA's own staff paper-- demands something more. It allows dispersion techniques to be used only if there is a demonstration that 'emission reduction sufficient to meet (the national standards) in the time specified (3 years) is unavailable or infeasible-- or, in the words of the Act-- only if they are 'necessary." EPA Staff Paper, supra, 119 Cong.Rec. at 10955.
 
 
 71
 This standard implies that a control strategy such as Georgia's tall stack strategy may be included in a state's plan only under one of two conditions. It may be included only (1) if it is demonstrated that emission limitation regulations included in the plan are sufficient standing alone, without the dispersion strategy, to attain the standards; or (2) if it is demonstrated that emission limitation sufficient to meet the standard is unachievable or infeasible, and that the state has adopted regulations which will attain the maximum degree of emission limitation achievable.
 
 
 72
 The EPA has never suggested that Georgia can meet the second of these conditions; it has, however, hinted that Georgia's emission limitation regulations may be sufficient by themselves to attain the standards. However, the record before us is unclear on that question. There are indications in the Georgia plan that the tall stack control strategy was a crucial part of the state's program for attaining the standards.[51] We are unable at this time and on this record to make a judgment as to whether the emission limitations in the Georgia plan will be sufficient to attain the national standards. More important, however, it would be inappropriate for us to make such a judgment, for it appears to us that the Administrator himself has never formally determined whether those requirements are independently sufficient to guarantee attainment of the national standards. All the Administrator determined in May 1972 was that the Plan, with the combination of those regulations and the tall stack regulations, would guarantee attainment of the standards; all he determined in May 1973 was that the tall stack regulations were inappropriate under the Agency's then emerging policy on dispersion enhancement techniques.
 
 
 73
 Under our holding, however, an explicit determination of this matter by the Administrator is a crucial first step in disposing of the petitioners' third objection. Accordingly, the first step in fashioning an order to dispose of that objection is to order the Administrator to make an explicit determination on this question. The Administrator should make this determination as promptly as is administratively feasible.
 
 
 74
 If the Administrator determines that the regulations are sufficient to assure attainment, he shall file with this Court a short statement of his conclusions and the grounds for it. The petitioners should respond promptly to such a filing by the Administrator. If the Administrator determines that the regulations are not independently sufficient to assure attainment, then it will be his duty to promulgate regulations which do assure attainment of the standards. If the Administrator does determine the existing regulations are insufficient to assure attainment, he should promptly notify the Court of his determination When and if the Administrator does make such a determination, we shall consider issuing further guidelines in accordance with this opinion to govern the process of preparing and publishing substitute regulations specifying a control strategy for particulates and sulfur dioxide in Georgia.
 
 V.
 
 75
 The petitioners' final challenge is to the Administrator's approval of portions of section 88-906 of the Georgia Code. That provision, entitled 'Factors to be considered in exercising powers and responsibilities related to air quality', sets out a list of factors the Board of Health and Department of Public Health are to consider in exercising their responsibilities under the Georgia air quality code. The petitioners object to the inclusion of five of these factors. These are:
 
 
 76
 (h) The availability of air-cleaning devices
 
 
 77
 (i). Economic feasibility of aircleaning devices
 
 
 78
 . . . .mic
 
 
 79
 (k). Effect on efficiency of industrial operations from use of aircleaning devices
 
 
 80
 . . . .t o
 
 
 81
 (o). The economic and industrial development of the State and the social and economic value of the source of air contaminants
 
 
 82
 (q). Other factors which the Department may find applicable.
 
 
 83
 The petitioners contend that the inclusion of these factors in the list undermines the intent of Congress that considerations of public health should always take precedence over considerations of economic impact or technical feasibility under the Clean Air Act.
 
 
 84
 We agree that the Administrator's approval of the challenged portions of this Georgia statute violated the Amendments. The statute implies that consideration of economic factors be limited in two respects. First, Congress made it clear that considerations of economic cost or technical feasibility were always to be subordinate to considerations of public health. Second, and as a corollary to this, Congress made it clear that cost and feasibility were not to be considered in meeting the three-year deadlines for attaining national primary standards. Those standards are set in terms of what is required for the protection of public health.
 
 
 85
 The legislative history of the Amendments, fortified by statements made by some of the draftsmen of the Amendments since the enactment of the Amendments, supports this conclusion. The House version of the Amendments included the phrase 'giving due consideration to the economic and technological feasibility of compliance'. The phrase was removed in the House-Senate Conference, after what Senator Thomas F. Eagleton remembers as 'hours' of debate.[52] The Senate Report on the Amendments states the essential position of the Amendments with respect to cost and feasibility factors:
 
 
 86
 The Committee determined that 1) the health of the people is more important than the question of whether the early achievement of ambient air quality standards protective of health is technically feasible; and 2) the growth of the pollution load in many areas, even with the application of available technology, would be deleterious to public health. Therefore, the Committee determined that existing sources of pollutants should meet the standard of law or be closed down . . ..
 
 
 87
 S.Rep. No. 91-1196 at 2-3 (1970). The Senate Subcommittee on Air and Water Pollution, which had been responsible for drafting the Senate version of the Amendments, sent a briefing paper to the Administrator in early 1972. In that paper, the Subcommittee stated its understanding of the matter:
 
 
 88
 Inclusion of a test of social and economic feasibility of compliance with those control requiremtnts necessary to achieve protection of public health as part of implementation plan guidelines compromises the intention of the Act . . .
 
 
 89
 Hearings Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works on the Implementation of th Clean Air Act Amendments of 1970, 92d Cong., 2d Sess. at 308 (1972).
 
 
 90
 The vice in section 88-906 is similar to the vice in Georgia's trade secrets provision: it is overinclusive. The provision does not distinguish between situations where cost and feasibility considerations compete with other considerations and those where they do not. It is, of course, appropriate for state air pollution control officials to take into account cost and feasibility factors in most circumstances; their doing so is proscribed only when those considerations are in conflict with considerations of public health. As it stands, the provision may deflect state officials from properly discharging their duties under the state implementation plan. And, like the trade secrets provision, it may invite time-consuming litigation brought by private parties, litigation which could impede the progress of the state's implementation plan.
 
 
 91
 In support of the Administrator's approval of the statute, the EPA notes that consideration of economic factors is proper in the context of the attainment of the national secondary standards, and asserts that section 88-906(h)-(i), (k), (o), and (q) will be applied only in that context. We cannot accept this argument. The language of the statute still exists on the statute books, and still, on its face, directs officials to weigh these considerations against considerations of public health. As long as this is the case, there will remain a danger that state officials will be influenced by the statute.
 
 
 92
 Thus we conclude that the Administrator's approval of the statute exceeded his authority, and direct him to publish forthwith his disapproval of section 88-906(h)-(i), (k), (o), and (q).
 
 ORDER
 
 93
 The actions the Administrator is directed to take in accordance with this opinion are set forth in the final paragraph of sections II, III, and V of this opinion, and in the final two paragraphs of section IV.
 
 
 94
 It is so ordered.
 
 
 
 [1]
 42 U.S.C. 1857-58a (1970). The Clean Air Act was originally enacted in 1963, Pub.L.No.88-206, 77 Stat. 392, and amended in relatively minor ways three times during the following seven years. Its present form, however, derives almost entirely from the amendments adopted in 1970. Clean Air Act Amendments of 1970, Pub.L.No.91-604, 84 Stat. 1676. Throughout the opinion, we use the 'Act' and the 'amendments' interchangeably
 The petitioners challenge an order made by the Administrator under 42 U.S.C. 1857c-5(a)(2). Jurisdiction in this court is conferred by 42 U.S.C. 1857h-5(b) (1), which confers jurisdiction on the appropriate circuit courts of appeals to hear petitions for review of orders of the Administrator approving state implementation plans under section 1857c-5(a)(2). See note 19 infra.
 
 
 [2]
 For our purposes in addressing the issues in this case, in particular the third objection raised by the petitioners, it is necessary to explain three terms used to define different categories of the kinds of 'enforceable controls' which may be employed to effect attainment of ambient air standards. The first, 'emission standards' refers to standards setting specific quantitative limits on the amounts given individual sources may emit into the air. The second, 'emission limitations', is an inclusive term referring to any type of control to reduce the amount of emissions into the air. This includes, of course, 'emission standards', but it also includes a number of regulary devices. These range from regulations directing sources of emissions to cease or curtail operations to regulations specifying limits on the sulfur content of fuel that fuel-burning emission sources may burn; 'trasportation controls' designed to reduce the use of motor vehicles, either through the development of mass transit systems, or through traffic control devices, commuter taxes, gasoline rationing, or parking restrictions; and the imposition of emission charges or other economic incentives aimed at inducing parties to reduce their emissions voluntarily. Both the terms 'emission limitations' and 'emission standards' are used at various points throughout the 1970 Amendments. See, e.g., 42 U.S.C. 1857c-6(a)(1), 1857c-6(d)(1), 1857c-7(b)(1), 1857h-2(a)(1), 1857c-5(a)(2)(B). See part IV-B infra
 The third term is 'dispersion enhancement techniques'. Dispersion enhancement techniques are devices which seek to reduce concentrations of pollutants not by reducing the amounts of pollutants emitted into the air, but rather by increasing the dispersion of pollutants throughout the atmosphere, so that pollutants are dispersed away from high-concentration areas and toward lower concentration areas. 'Dispersion enhancement' techniques and 'emission limitation' techniques thus constitute mutally exclusive categories. There are two major types of dispersion enhancement techniques. One, 'intermittent' or 'supplementary' control systems, involves staggering the hours of operation at industrial facilities which are major source of pollution, so that the industries operate most extensively when meteorological conditions are favorable to dispersion, and curtail, or sometimes cease, operations when meteorological conditions do not favor dispersion. Another, at issue in this suit, involves the construction of high smokestacks at emission sources. The theory is that the higher the altitude at which pollutants are emitted, the more widely dispersed they will be.
 On the range of 'control strategies' that may be used in attaing the ambient standards, see Guidelines for the Preparation, Adoption and Submittal of Implementations Plans. 40 C.F.R. 51.1(n) (1972).
 
 
 [3]
 See generally S.Doc.No.91-63, at 100-03 (1970); Hearings Before the Subcomn. on Air and Water Pollution of the Senate Comm. on Public Works on the Implementation of the Clean Air Act Amendments of 1970, 92d Cong., 2d Sess., pt. 1 at 717 (1972); Note, The Clean Air Act Amendments of 1970: A Congressional Cosmetic, 61 Geo.L.J. 153, 160-61 (1972)
 
 
 [4]
 'Criteria pollutants' are so called because they are the pollutants for which the Administrator has issued 'air quality criteria'-- information about the extent and nature of the deleterious effects of the pollutant-- under 42 U.S.C. 1857c-3. Criteria pollutants are defined as those substances 'having an adverse effect on public welfate' and whose 'presence . . . in the ambient air results from numerous or diverse mobile or stationary sources'. Id. 1857c-3(a) (1)
 At present, there was six categories of 'criteria pollutants': sulfur oxides; catbon monoxide; nitrogen dioxide; the hydrocarbons; particulate matter; and the photochemical oxidants. See 40 C.F.R. 50 (1972).
 
 
 [5]
 Language in a definitional provision of the statute explains the meaning of 'effects on public welfare':
 All language referring to effects on public welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being.
 42 U.S.C. 1857h(h).
 
 
 [6]
 Id. 1857c-5(a)(1)
 
 
 [7]
 Id. 1857c-5(a)(2)(A)(i)
 
 
 [8]
 Id. 1857c-5(a)(2)(A)(ii)
 
 
 [9]
 Id. 1857c-5(a)(2)(B)
 
 
 [10]
 Id. 1857c-5(a)(2)(C)(i)
 
 
 [11]
 Id. 1857c-5(a)(2)(F)(i)
 
 
 [12]
 Id. 1857c-5(a)(2)(F)(iii)-(iv)
 
 
 [13]
 Id. 1857c-5(a)(2)
 
 
 [14]
 Id. 1857c-5(c)
 
 
 [15]
 Id
 
 
 [16]
 Id. 1857c-5(e)(1)
 
 
 [17]
 Id. 1857c-5(f). This provision is quoted in full at note 29 infra
 
 
 [18]
 See note 4 supra
 
 
 [19]
 Section 1857h-5(b)(1) provides:
 A petition for review of the Administrator's action in approving or promulating any implementation plan under section 1857c-5 . . . or section 1857c-6(d) . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such 30th day.
 
 
 [20]
 Ga.Code Ann. 88-908 provides in full:
 Any information relating to secret processes, devices, or methods of manufacture or production obtained by the board, Department or their employees in the administration of this Act shall be kept confidential.
 
 
 [21]
 See also 40 C.F.R. 51.10(e), -.11(a)(6) (1972)
 
 
 [22]
 Section 1857h-2(a) provides:
 (a) Except as provided in subsection (b), any person may commence a civil action on his own behalf--
 (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) and emission standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
 (2) against the Administrator where there is alleged a failure of the Administrator to perform any act of duty under this Act which is not discretionary with the Administrator. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be.
 
 
 [23]
 The connection between the information sections of the statute, section 1857c-5(a)(2)(F)(iii, iv) and section 1857c-9(c), and the citizen enforcement provision is recognized in the legislative history of the Act. See S.Rep.No.91-1196, at 38 (1970); Hearings Before the Subcomm. on Air and Water Pollution of the Comm. on Public Works, on S. 3229, S. 3466, S. 3546, 91st Cong., 2d Sess., at 828, 829-30 (statement of Professor James W. Jeans, Chairman of the American Trial Lawyers' Committee on Environmental Laws)
 
 
 [24]
 Ga.Code Ann. 88-916 (1971) provides that 'any person who shall violate any of the provisions of . . . this Act' shall be guilty of a misdemeanor. The petitioners contend this provision could be read to impose penalties on Georgia officials who release emission information in violation of 88-908
 
 
 [25]
 The fourteen were Delaware, the District of Columbia, Idaho, Iowa, Kansas, Kentucky, Missouri, Nebraska, New Jersey, Rhode Island, Vermont, Washington, Wisconsin, and Wyoming. See 37 Fed.Reg. 10842 et seq. (May 31, 1972), announcing 40 C.F.R. 52 (passim). See also Natural Resources Defense Council v. EPA, 1 Cir. 1973, 478 F.2d 875, 891-893 (invalidating Administrator's approval of a similar confidentiality provision in Massachusetts)
 '(f)(1) Prior to the date on which any action here, and to distinguish it from his action in the fourteen earlier instances, on the basis of two informal assurances EPA officials received from Georgia authorities. One came in a letter to the EPA dated May 4, 1972, from Robert H. Collom, Jr., then Chief of the Air Quality Control Section of the Environmental Protection Division of Georgia's Department of Natural Resources; the other was conveyed in a telephone conversation, on November 16, 1971, between EPA attorneys and Mr. Robert Bomar, then a Georgia assistant attorney general. The EPA asserts that it was these two assurances which led the Administrator to conclude that 88-908 would never be applied to require that emission data be kept confidential.
 We have examined the Collon letter and have considered the EPA's account of the Bomar telephone conversation, however, and we find it impossible to say that those two informal assurances provide an adequate basis for the conclusion the Administrator allegedly drew. Those assurances cannot dispel the reasonable fear voiced by the petitioners that section 88-908 may interfere with the purposes of 1857c-5(a)(2)(F)(iii), (iv).
 
 
 [27]
 The Georgia variance provision provides in full:
 The department may grant specific or general classes of variances from the particular requirements of any rule, regulation or general order to such specific persons or class of persons or such specific source or general classes of sources of air contaminants upon such conditions as it may deem necessary to protect the public health and welfare, if it finds that strict compliance with such rule, regulation or general order is inappropriate because of conditions beyond the control of the person or classes of persons granted such variances, or because of special circumstances which would render strict compliance unreasonable, unduly burdensome, or impractical due to special physical conditions or causes, or because strict compliance would result in substantial curtailment or closing down of one or more businesses, plants or operations, or because no alternative facility or method of handling is yet available. Such variances may be limited in time. In determining whether or not such variances shall be granted, the department shall be give consideration to the protection of the public health, safety and general welfare of the public, and weigh the equities involved and the relative advantages and disadvantages to the resident and the occupation or activity affected. Any person or persons seeking a variance shall do so by filing a petition therefor with the director of the department. The director shall promptly investigate such petition and make a recommendation as to the disposition thereof. If such recommendation is against the granting of the variance, a hearing shall be held thereon within 15 days after notice to the petitioner. If the recommendation of the director is for the granting of a variance, the department may do so without a hearing; Provided, however, that upon the petition of any person aggrieved by the granting of a variance, a public hearing shall be held thereon. A variance granted may be revoked or modified by the department after giving at least 15 days prior be held after giving at least 15 days prior notice. Such notice shall be served upon all persons, known to the department, who will be subjected to greater restrictions if such variance is revoked or modified, or are likely to be affected or who have filed with the department a written request for such notification.
 Ga.Code Ann. 88-912.
 
 
 [28]
 The petitioners also object to the variance provision on the grounds (1) that it permits and directs Georgia officials to take into account economic and technical feasibility considerations to an impermissible extent; and (2) that it would undermine the state's legal authority to prevent the construction or modification of new stationary sources of emissions, in violation of 42 U.S.C. 1857c-5(a)(2)(D), (a)(4). Because we hold the statute should not have been approved on the principal ground the petitioners advance, we have no occasion to address these contentions
 
 
 [29]
 42 U.S.C. 1857c-5(f) provides in full:
 '(f)(1) Prior to the date on which any stationary source or class of moving sources is required to comply with any requirement of an applicable implementation plan the Governor of the State to which such plan applies may apply to the Administrator to postpone the applicability of such requirement to such source (or class) for not more than one year. If the Administrator determines that--
 '(A) good faith efforts have been made to comply with such requirement before such date,
 '(B) such source (or class) is unable to comply with such requirement because the necessary technology or other alternative methods of control are not available or have not been available for a sufficient period of time,
 '(C) any available alternative operating procedures and interim control measures have reduced or will reduce the impact of such source on public health, and
 '(D) the continued operation of such source is essential to national security or to the public health or welfare, then the Administrator shall grant a postponement of such requirement.
 '(2)(A) Any determination under paragraph (1) shall (i) be made on the record after notice to interested persons and opportunity for hearing, (ii) be based upon a fair evaluation of the entire record at such hearing, and (iii) include a statement setting forth in detail the findings and conclusions upon which the determination is based.
 '(B) Any determination made pursuant to this paragraph shall be subject to judicial review by the United States Court of Appeals for the circuit which includes such State upon the filing in such court within 30 days from the date of such decision of a petition by and interested person praying that the decision be modified or set aside in whole or in part. A copy of the petition shall forthwith be sent by registered or certified mail to the Administrator and thereupon the Administrator shall certify and file in such court the record upon which the final decision complained of was issued, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition the court shall have jurisdiction to affirm or set aside the determination complained of in whole or in part. The findings of the Administrator with respect to questions of fact (including each determination made under subparagraphs (A), (B), (C), and (D) of paragraph (1)) shall be sustained if based upon a fair evaluation of the entire record at such hearing.
 '(C) Proceedings before the court under this paragraph shall take precedence over all the other causes of action on the docket and shall be assigned for hearing and decision at the earliest practicable date and expedited in every way.
 '(D) Section 307(a) (relating to subpenas) shall be applicable to any proceedding under this subsection.'
 
 
 [30]
 42 U.S.C. 1857c-5(a)(3) provides in full:
 '(3) The Administrator shall approve any revision of an implementation plan applicable to an air quality control region if he determines that it meets the requirements of paragraph (2) and has been adopted by the State after reasonable notice and public hearings.'
 
 
 [31]
 The Administrator's basic position is stated by 40 C.F.R. 51.32(f):
 A State's determination to defer the applicability of any portion(s) of the control strategy with respect to such source(s) will not necessitate a request for postponement under this section unless such deferral will prevent attainment or maintenance of a national standard within the time specified in the plan: Provided, however, that any such determination will be deemed a revision of an applicable plan under 51.6
 
 
 [40]
 C.F.R. 51.15(d) provides further:
 Except as otherwise provided by Subpart C of this part, neither the State agency nor a local agency shall grant any variance of, or exception to, any compliance schedule included in an applicable plan if such variance or exception will prevent, or interfere with, attainment or maintenance of a national standard within the time(s) speciffied pursuant to 51.10(b) and (c).
 
 
 [32]
 The view of the First Circuit was followed recently by the Eighth Circuit in deciding the NRDC's challenge to the Iowa state plan. Natural Resources Defense Council v. EPA, 8 Cir. 1973, 483 F.2d 690, 693-694
 
 
 [33]
 For the definition of the term 'control strategy', and some examples of alternative 'control strategies', see the Guidelines for the Preparation, Adoption and Submittal of Implementation Plans, 40 C.F.R. 51.1(n) (1972)
 
 
 [34]
 See note 2 supra
 
 
 [35]
 Dispersion enhancement techniques and emission limitation techniques are, in the sense in which we use the terms, mutually exclusive categories. See note 2 supra
 
 
 [36]
 The EPA's proposed regulation provides in full:
 (h) The increase of stack height up to a height consistent with good engineering practice is acceptable without qualification. An increase on stack height beyond this level is not an acceptable air quality control procedure unless accomplished as part of an approved supplementary control system (see Appendix P to this part). A stack which conforms to good engineering practice is sufficiently tall that emissions from the stack are unaffected by the atmospheric downwash, eddies and wakes which may be created by the facility itself, nearby structures or terrain obstacles. Emissions from facilities with stacks which do not conform to good engineering practice often cause excessively high ground-level concentrations and nuisances within and in the vicinity of the facility itself. For fairly level terrain, good engineering practice is normally taken to be a stack height 2 1/2-times the height of the facility or nearby structure. For complex terrain, the 2 1/2-times rule-of-thumb is too simplistic. For such cases, and for more detailed information on good engineering practices, the references listed should be consulted. 37 Fed.Reg. 25701 (September 14, 1973), proposing 40 C.F.R. 51.13(h).
 This regulation would not by its own terms limit the use of unrestricted height increases to isolated sources; but that limitation is implied in the limitation to situations where stack height increases are part of 'an approved supplementary control system', since other parts of the proposed regulations limit the use of supplementary control systems to large, isolated sources. 'Supplementary control systems' refer to systems whereby industrial operations are staggered according to meteorological conditions in order to enhance dispersion, described briefly in note 2 supra.
 
 
 [37]
 The Administrator of the EPA is empowered to publish his own regulations if a state fails to revise its plan after having been notified by the Administrator of the need to do so. 42 U.S.C. 1857c-5(c)(3)
 
 
 [38]
 Ga.Rules and Regulations for Air Quality Control 270-5-24.02(2)(d)-(e). Those provisions are described more fully in part IV-C
 
 
 [39]
 See also note 51 infra
 
 
 [40]
 'Hazardous air pollutants' are defined by the statute as substances 'to which no ambient air quality standard is applicable and which . . . may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness'. 42 U.S.C. 1857c-7(a) (1). Compare the definition of criteria pollutants quoted at note 4 supra
 Under the Amendments, emissions of hazardous air pollutants from any source, and all emissions from new stationary sources, are to be regulated wholly by federal emission standards. In these two contexts, the statute abandons the 'two-phase' approach to standard-setting adopted by section 1857c-3-5 for the control of emissions of the major 'criteria' pollutants from existing stationary sources; no ambient standards are set or employed, and reliance is placed instead entirely upon emission standards. The emission standards for new sources are standards 'which reflect the (best) degree of emission limitation achievable through the application of the best system of emission reduction' which has been adequately demonstrated, 1857c-6(a)(1), (b)(1)(B); the standards for hazardous pollutants are standards 'which in (the Administrator's) judgment provide an ample margin of safety to protect the public health from such hazardous air pollutant'. 1857c-7(b)(1)(B).
 
 
 [41]
 The principal textual basis of the policy is contained in the Act's statement of purposes. Section 1857(b)(1) announces that a purpose of the Clean Air Act is 'to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare'. An administrative regulation under the 1967 Amendments to the Act, published by the Department of Health, Education, and Welfare, the agency which at that time was responsible for the administration of the Act, was the first to recognize that the 'protect and enhance' language implied a nondegradation policy:
 An explicit purpose of the Act is 'to protect and enhance the quality of the Nation's air resources'. Air quality standards which, even if fully implemented, would result in significant deterioration of air quality in any substantial portion of an air quality region clearly would conflict with this expressed purpose of the law.
 National Air Pollution Control Administration, U.S. Department of Health, Education, and Welfare, Guidelines for Development of Air Quality Standards and Implementation Plans, Part I 1.51, at 7 (1969).
 The legislative history of the 1970 Amendments abundantly demonstrates that the position taken in the old HEW regulations was valid and that it would remain so under the 1970 Amendments. Both then Secretary of HEW Finch and his Undersecretary Veneman testified that nondegradation was and would be a policy of the Clean Air Act during the 1970 hearings on the Amendments. Hearings Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works on S. 3229, S. 3466, S. 3546, 91st Cong., 2d Sess. at 132-33, 143 (1970); Hearings on Air Pollution and Solid Waste Recycling Before the Subcomm. on Public Health and Welfare of the House Interstate and Foreign Commerce Comm., 91st Cong., 2d Sess. at 280, 287 (1970). More important, the Senate Report on the Amendments openly and unequivocally embraced the nondegradation policy:
 In areas where current air pollution levels are already equal to or better than tha air quality goals, the Secretary shall not approve any implementation plan which does not provide, to the maximum extent practicable, for the continued maintenance of such ambient air quality.
 S.Rep.No.91-1196 at 2 (1970). The House Report implies the same thing. H.R.Rep.No.91-1146 at 1, 2, 4 (1970).
 
 
 [42]
 Georgia Rules and Regulations for Air Quality Control 270-5-24-. 02(2)(e)
 
 
 [43]
 Id. 270-5-24-.02(2)(d)
 
 
 [44]
 Id. 270-5-24-.02(2)(m)
 
 
 [45]
 Air Quality Control Branch, Georgia Department of Public Health, Implementation Plan for Attainment of State and National Ambient Standards at 91 (1972) (hereinafter cited as Georgia State Plan); Record at 340
 
 
 [46]
 Georgia Rules and Regulations for Air Quality Control 270-5-24-. 02(2)(g) (1)
 
 
 [47]
 Id. 270-5-24-.02(2)(g)(3)
 
 
 [48]
 See note 2 supra
 
 
 [49]
 The EPA asserted before us that sulfuric acid plants used the only manufacturing process in Georgia which was a source of sulfur dioxide emissions. The petitioners did not contest the assertion, and we accept it as true. A special section of the Georgia regulations imposes a special limit on SO(2) emissions from sulfuric acid plants. Georgia Regulations 270-5-24-.02(2) (j)
 
 
 [50]
 If this were sufficient to satisfy the requirement of section 1857c-5(a) (2)(B), that requirement could be easily evaded. A state desiring to rely on a dispersion 'control strategy' could simply include in its plan a regulation stating a quantitative limit on emissions so high that no source would ever need be concerned about it. The state would in effect be relying entirely upon its dispersion regulations to meet the standards; but its plan would contain an emission limitation formally applicable to every source in the state
 If this possibility seems far-fetched, it nonetheless serves to emphasize the fact that in enforcing the requirement of section 1857c-5(a)(2)(B), where a state plan includes both emission limitations and dispersion enhancement controls, a reviewing court must scrutinize the emission limitations included in the plan to determine the relative degrees of reliance the state plan places upon emission limitation and dispersion enhancement. Once that fact is recognized, the only question is what the objective of such scrutiny should be; and, in our view, the implication of the so-called 'broad approach' to section 1857c-5(a)(2)(B) is that the objective should be to determine whether the reliance placed upon emission limitation is as great as possible.
 
 
 [51]
 With respect to particulates, the Plan states:
 The stack height limitation prevents large sources, even though they meet the requirement based on heat input or process weight rater, from releasing large quantities of particulates from short stacks and thereby causing the ambient standard to be exceeded.
 Georgia Plan at 91; Record, at 340. With respect to sulfur dioxide, the Plan seems to indicate fairly clearly that the stack-height regulations were adopted as a substitute for available emission reduction devices:
 Since the economics and efficiency of SO(2) removal equipment are uncertain at this time, no boiler curve or process weight rater formula were adopted for existing sources. The stack height formula for SO(2) emissions does insure that ambient conditions will not exceed the air quality standards, by requiring restrictions on emissions from stacks which are too short for the amount of SO(2) emitted. If a source is in excess of the emissions allowed by the stack height formula then the options of SO(2) removal or stack height extension are available. Id.
 
 
 [52]
 Senator Eagleton stated in February 1972:
 On this question of an economic factor, I am as positive about this as a mortal can be, that was specifically written out of the bill because many hours were spent in conference debating the economic feasibility factor and the House had such language in the bill as, 'Giving due consideration to economic and technological feasibility of compliance.' That appeared in more than one place in the House bill and it was stricken from the bill in conference to go back to the Senate version which had no economic factor as far as protection of public health was concerned.
 Hearings Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works on the Implementation of the Clean Air Act Amendments of 1970, 92d Cong., 2d Sess., at 21 (1972).