**WEST PENN POWER COMPANY, a corporation, Appellant,**

v.

**Russell TRAIN, Administrator of the Environmental Protection Agency of the United States of America, et al.**

**No. 74–2050.**

United States Court of Appeals, Third Circuit.

Argued April 28, 1975.

Decided July 16, 1975.

As Amended Aug. 15, 1975.

**304**

Harold R. Schmidt, Lawrence A. Demase, and Edwin J. Strassburger, Rose, Schmidt & Dixon, Pittsburgh, Pa., and Thomas K. Henderson, Greensburg, Pa., for appellant.

Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Martin Green, Attys., and John E. Varnum, Chief, App. Section, U. S. Dept. of Justice, Washington, D. C., for appellee Russell Train.

Barbara H. Brandon, Asst. Atty. Gen., Commonwealth of Pennsylvania, Harrisburg, Pa., for appellee Maurice K. Goddard and appellee Dept. of Environmental Resources of the Commonwealth of Pennsylvania.

Before VAN DUSEN, ADAMS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal challenges a June 19, 1974, district court order dismissing West Penn Power Company's amended complaint for lack of jurisdiction.[1] The dismissed complaint sought injunctive and declaratory relief protecting West Penn from any duty to comply with the particulate and sulfur compound emission standards established as part of Pennsylvania's implementation plan[2] pursuant

---

1. The district court opinion and order of June 19, 1974, are docketed as Document # 24 in Civil No. 73–1083, 378 F.Supp. 941 (W.D.Pa.). The memorandum and order of August 13, 1974, denying the motion for reconsideration of the June 19 order was docketed as Document # 29 in Civil No. 73–1083 (W.D.Pa.).

2. 25 Pa.Code Ch. 123 contains the particulate matter and sulfur compound emission stan-

dards relevant to this action. 25 Pa.Code Chs. 121–141 comprise the regulations which form Pennsylvania's implementation plan. The plan was adopted by the Environmental Quality Board of the Commonwealth of Pennsylvania on January 27, 1972, and approved by the Administrator of the Environmental Protection Agency (EPA) on May 31, 1972. 37 Fed.Reg. 10889; 42 U.S.C. § 1857c–5(a)(1) and (2).

to the Clean Air Act, 42 U.S.C. § 1857 *et seq.*[3]

West Penn did not file a petition for review under 42 U.S.C. § 1857h–5(b)(1)[4] to challenge the implementation plan when it was approved, but petitioned the Pennsylvania Department of Environmental Resources (DER) for a variance[5] from the particulate, visible, and sulfur compound emission standards applicable to Boiler No. 33 of West Penn's Mitchell Power Station. On September 13, 1973, before DER had acted on its variance request[6] West Penn received from EPA a Notice of Violation[7] charging that the Mitchell Power Station was in violation of the applicable particulate and sulfur compound emission standards. Thereafter, on September 19, 1973, DER granted West Penn a temporary variance until June 30, 1976, from the sulfur emission standards.[8] The variance, however, rejected West Penn's proposal that it use a "tall stack" and low sulfur coal to meet the standards;[9] installation of a "scrubber" device for controlling sulfur compound emissions was a condition of the variance. This temporary variance has not been approved by EPA.[10]

West Penn first appealed DER's variance order to the Pennsylvania Environ-

---

3. The Clean Air Act was amended by the Air Quality Act of 1967, 81 Stat. 485, and the Clean Air Amendments of 1970, Pub.L. 91–604, 84 Stat. 1676. The 1970 amendments to the Clean Air Act required the EPA to propose primary and secondary air quality standards. 42 U.S.C. § 1857c–4. Within nine months after the promulgation of each of these standards, every state was to adopt and submit to the Administrator of the EPA "a plan which provides for implementation, maintenance, and enforcement" of the standards. 42 U.S.C. § 1857c–5. In accordance with the statutory scheme, Pennsylvania held four public hearings on its proposed plan. The record does not reveal whether West Penn appeared at any of the hearings, which were held from December 1–4, 1971. The plan, including the emission standard which generated this suit, was adopted by the Pennsylvania Environmental Quality Board on January 27, 1972; the plan provisions relevant to this suit were approved by the EPA Administrator on May 31, 1972. 37 Fed.Reg. 10889. For a fuller description of the legislative scheme, see *Duquesne Light Co. v. EPA,* 481 F.2d 1, 3–5 (3d Cir. 1973).

4. 42 U.S.C. § 1857h–5(b)(1) provides in pertinent part:
   "A petition for review of the Administrator's action in approving or promulgating any implementation plan . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation, approval, or action, or after such date if such petition is based solely on grounds arising after such 30th day."
   In addition to challenging the plan as a whole under the above statute, West Penn could have sought relief from the operation of particular requirements of the plan by seeking a variance pursuant to 35 Purdon's Pa.Stats. § 4004(41) and 42 U.S.C. § 1857c–5(a)(3).

5. See generally 25 Pa.Code Ch. 141. Chapter 141 was adopted January 27, 1972, and approved by EPA on May 31, 1972.

6. The petition for variance, originally filed September 15, 1972, was amended on June 7, 1973. In its amended petition, West Penn proposed to reduce sulfur compound emissions by burning low sulfur coal and by building a "tall stack" to reduce ground-level concentration of the pollutant. West Penn further stated its intent to "install sulfur-control equipment as soon as commercially proven, reliable, and environmentally acceptable equipment is available." Particulate matter was to be controlled by use of an electrostatic precipitator and by chemical treatment of the flue gas.

7. The notice of violation was issued pursuant to 42 U.S.C. § 1857c–8(a)(1), which provides:
   "Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order requiring such person to comply with the requirements of such plan or he may bring a civil action in accordance with subsection (b) of this section."

8. Particulate emission standards were to be met by November 1, 1973.

9. See note 6 *supra.*

10. See 42 U.S.C. § 1857c–5(a)(3); *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 90–94, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Getty Oil Co. v. Ruckelshaus,* 467 F.2d 349, 358 (3d Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).

mental Hearing Board [11] and then, on December 20, 1973, filed this action against the Administrator of EPA, Train, the Secretary of DER, Goddard, and DER.[12] The complaint, as amended,[13] asked for a declaratory judgment both that the tall stack scheme for effecting compliance with Pennsylvania's implementation plan could not be rejected by the defendants and that West Penn was not presently violating the plan. West Penn also sought preliminary and permanent injunctions against EPA enforcement of the September 13, 1973, Notice of Violation and DER enforcement of the order to install a "scrubber." [14] Jurisdiction was predicated upon "the Clean Air Act, 42 U.S.C. § 1857 et seq., specifically 42 U.S.C. § 1857h–2 [entitled "Citizen suits—Es-

tablishment of right to bring suit"]; [15] The Administrative Procedure Act, 5 U.S.C. § 701 et seq.; [16] The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and 28 U.S.C. § 1337." [17] Amended Complaint, ¶ 6, Civil Action No. 73–1083, Document # 20 (W.D.Pa.).

On June 19, 1974, after the three defendants had filed F.R.Civ.P. 12(b) motions to dismiss for lack of subject matter jurisdiction,[18] the district court dismissed the amended complaint in its entirety, as to all defendants. The court first determined that it lacked jurisdiction over the EPA Administrator, Train. Relying on *Getty Oil Co. v. Ruckelshaus*, 467 F.2d 349 (3d Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973), the district court concluded

---

**11.** See 35 Purdon's Pa.Stats. §§ 4004(4.1), 4013.5, and 71 Purdon's Pa.Stats. § 1710.41. The action is docketed at Environmental Hearing Board No. 73–330.

**12.** Before filing suit in federal court, West Penn participated in a series of meetings held by EPA from October 18 to November 2, 1973. Among the topics under investigation at this conference was the state of the art of sulfur emission control.

**13.** The original complaint named only EPA and DER as defendants. After a March 7, 1974, hearing on the motions to dismiss filed by EPA and DER in January 1974, West Penn amended its complaint to add the Secretary of DER as a defendant.

**14.** In its brief, West Penn avers that the complaint also asked for "a decree that the installation of flue gas desulfurization device ["scrubber"] on Boiler No. 33 would not effect compliance with the Pennsylvania implementation plan after the expiration of the variance period." Brief for Plaintiff-Appellant at 5. We agree with defendant Secretary of DER that the complaint cannot be construed as raising such an issue.

**15.** "§ 1857h–2. Citizen suits—Establishment of right to bring suit

"(a) Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—

.   .   .   .   .

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

"The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be.

Notice
"(b) No action may be commenced—

.   .   .   .   .

(2) under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Administrator."

**16.** See Part II, *infra*. Neither the APA nor 28 U.S.C. § 1337, see note 17, *infra*, was alleged as a jurisdictional basis in the original complaint.

**17.** "§ 1337. Commerce and anti-trust regulations.

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

The complaint relied on the Clean Air Act, 42 U.S.C. § 1857 et seq., as an act of Congress regulating commerce within the scope of § 1337.

**18.** DER and Goddard also argued that the Eleventh Amendment precluded the court from exercising personal jurisdiction over them. Other grounds for dismissal urged by DER and Goddard were: failure to join indispensable parties; no exhaustion of administrative remedies; failure to state a claim upon which relief could be granted; and the abstention doctrine.

that neither the Declaratory Judgment Act (DJA) nor the Administrative Procedure Act (APA) furnished a jurisdictional base for West Penn's suit against Train.[19] No jurisdiction lay under § 1857h–2 because West Penn had not given Train 60 days' notice of the suit, as required by that section.[20] Having thus rejected each of West Penn's jurisdictional claims,[21] the district court went on to find that, in any event, 42 U.S.C. § 1857h–5(b)(1) and (2)[22] foreclosed district court jurisdiction over the action. Since the district court determined that all issues raised in the complaint could have been brought before the court of appeals in an action challenging the Pennsylvania implementation plan, it held that West Penn's exclusive recourse against Train was a proceeding under 42 U.S.C. § 1857h–5(b)(1).

As to DER, the court held the action barred by the Eleventh Amendment.[23] The court also concluded that it lacked jurisdiction over the Secretary of DER, Goddard. The court viewed West Penn's assertion that DER lacked power to reject a "tall stack" or to direct installation of a "scrubber" as, essentially, a challenge to the Pennsylvania implementation plan. Such a challenge could be brought only in the court of appeals pursuant to 42 U.S.C. § 1857h–5(b)(1) and (2). The district court opinion recognized that a variance from the air quality standards would remedy West Penn's complaint, but noted that the temporary variance issued by DER on September 19, 1973, was ineffective without EPA approval, which the court could not compel.[24] This lack of jurisdiction over the

**19.** The court considered and rejected the allegation of jurisdiction under 28 U.S.C. § 1337 together with the APA and DJA claims.

**20.** The district court opinion set forth the notice provisions applicable to subsection (a)(1), rather than (a)(2). See note 15 *supra*. However, 60 days' notice is required in either case, so that the mis-citation was immaterial.

As a second reason for rejecting § 1857h–2 jurisdiction, the district court relied on the discretionary nature of the Administrator's action "in approving the Pennsylvania plan, and including therein a provision which prevents plaintiff from using the so-called tall stack as a method of compliance with the ambient air standards." § 1857h–2 applies only to cases where the Administrator fails to perform a non-discretionary Act. To the extent that *Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), suggests the Administrator's discretion is more limited than the district court inferred from its reading of 42 U.S.C. § 1857c–5, this second ground might not, alone, be dispositive of the claim under § 1857h–2. The failure to give notice, however, suffices to preclude § 1857h–2 jurisdiction. Moreover, West Penn has not appealed this jurisdictional holding. But see *Metropolitan Washington Coalition for Clean Air v. District of Columbia*, 373 F.Supp. 1089, 1092 (D.D.C.1974).

**21.** See note 19 *supra*.

**22.** See note 4 *supra*. 42 U.S.C. § 1857h–5(b)(2) provides:

"(2) Action of the Administrator with respect to which review could have been

obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."

**23.** This holding was not appealed.

**24.** See discussion at 306, *supra*. The district court relied on *Natural Resources Defense Council, Inc. v. Environmental Protection Agency*, 489 F.2d 390 (5th Cir. 1974), in stating that a valid variance could only be obtained upon application of the Governor of Pennsylvania for a one-year extension of the compliance date for the implementation plan. This elaborate procedure for obtaining a postponement of the compliance date is contained in 42 U.S.C. § 1857c–5(f). Since the district court authored its opinion, the Supreme Court has reversed the Fifth Circuit decision, *supra*, and held, in *Train v. NRDC*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), that a variance can be obtained pursuant to § 1857c–5(a)(3), rather than § 1857c–5(f). Under § 1857c–5(a)(3), a variance becomes effective merely upon approval by the EPA Administrator. Further, the Administrator is to grant the variance "if he determines that it meets the requirements of [§ 1857c–5(a)(2), which sets forth criteria for an acceptable implementation plan] and has been adopted by the State after reasonable notice and public hearings." The Supreme Court's holding in NRDC, however, does not invalidate the district court's finding that West Penn had not obtained an effective variance, since the EPA had not approved the temporary variance under § 1857c–5(a)(3). See 421 U.S. at 89–98, 95 S.Ct. at 1488, and n.28. Nor, we believe, does the district court's reliance on the Fifth Circuit decision in NRDC

EPA Administrator, Train, rendered federal court intervention "futile," since Goddard could not grant a variance or approve a "tall stack" without EPA concurrence. Finally, the court found that Pennsylvania law (35 Purdon's Pa.Stats. § 4004(4.1)) offered West Penn ample relief, without any need for federal intervention.

West Penn filed a timely motion for reconsideration challenging the dismissal of the complaint only as to Train and Goddard. On September 10, 1974, after the district court denied the motion, West Penn lodged this appeal. Although it is not clear precisely which aspects of the district court's decision West Penn is appealing,[25] we will treat the appeal as raising the following three questions:

(1) whether the district court properly concluded that § 1857h–5(b)(1) and (2) required dismissal of the complaint as to both Train and Goddard;

(2) whether the district court has jurisdiction under the APA[26] of matters raised in the complaint; and

(3) whether due process requires the district court to assume jurisdiction and decide the issues raised in the complaint.

I. EXCLUSIVITY OF THE REVIEW PROVIDED IN 42 U.S.C. § 1857h–5(b)(1) and (2)

West Penn claims that EPA could not cite the utility for violating Pennsylvania's implementation plan since West Penn, by filing a petition for a variance on September 15, 1972, received an automatic stay of prosecution for violation of the particulate and sulfur compound emission standards. This argument relies on 25 Pa.Code § 141.5, which provides:

"(a) A petition which complies with the requirements of § 141.11 of this Title (relating to filing), and which is received by the Department within six months of the effective date of this Chapter, shall operate prospectively as an automatic stay of prosecution for violations of those provisions of this

---

undercut its conclusion that it lacked authority to compel the grant of a variance to West Penn. A mandamus action, though not proper under § 1857c–5(f) because of the great discretion which the district court identified as implicit in that section, might be proper under § 1857c–5(a)(3). However, no factual or legal argument made by West Penn in this action would support issuance of a mandamus. Therefore, West Penn was not prejudiced by the district court's view that issuance and approval of a variance was discretionary.

**25.** For example, the complaint seeks declaratory and injunctive relief as to two issues: (1) whether West Penn is presently in violation of the plan's emission standards, and (2) whether a tall stack would comply with the plan. See note 14, *supra*. In arguing that the district court erred in holding that § 1857h–5(b)(2) required dismissal of the complaint, West Penn urges only that the first issue could not have been raised in a subsection (b)(1) proceeding. Brief for Plaintiff-Appellant at 13–17. It thus appears to concede that the district court properly dismissed the complaint as to the second issue. Such a concession would also amount to an admission that Goddard was properly dismissed as a defendant, since the only cause of action the complaint alleged against Goddard was that he lacked authority

to reject a tall stack and order installation of a scrubber as a means of achieving compliance with the plan. Similarly, West Penn's argument that the district court has jurisdiction under the APA postulates power to decide only the first issue raised in the complaint. Brief for Plaintiff-Appellant at 18–23. At the same time, however, the summary of the argument describes the brief as arguing "at length" that subsection (b)(2) did not bar "jurisdiction to consider West Penn's claims against the remaining defendants." Brief for Plaintiff-Appellant at 10, n. 3. It is true that arguments in support of inconsistent alternative claims are permitted under the Federal Rules of Civil Procedure. In this case, however, the arguments are not alternative, but serial, and the inconsistencies in the arguments briefed merely produce unnecessary confusion into a case not otherwise complex.

**26.** West Penn does not argue on this appeal that jurisdiction lies under § 1337. *But see Dunlop v. Bachowski*, 421 U.S. 560, 566, 95 S.Ct. 1851, 44 L.Ed.2d 377 (June 2, 1975). It also concedes that the DJA is not jurisdictional in nature, but "defines the form of relief available to an aggrieved party under the Administrative Procedure Act." Brief for Plaintiff-Appellant at 11, n. 4.

Article with respect to which the variance is sought, until one year after the effective date of this Chapter or until the Department takes action on such petition, whichever occurs first, except that the filing of a petition for a variance, or the grant thereof, shall not relieve the petitioner from full compliance with any orders and permits previously issued or any stipulations and agreements previously entered into by the Department, nor shall such filing in any way preclude the Department from pursuing any and all remedies available to it, at law or in equity, to enforce such orders, permits, stipulations, or agreements."

West Penn avers that this stay was in effect on September 13, 1973, "and will remain so at least through June 30, 1975." Brief for Plaintiff-Appellant at p. 10, n.3.

■■■ In addition, West Penn argued, both in its brief at 9 and before this court, that it has a variance from DER, granted September 19, 1973, which exempts it from complying with the sulfur emission standards until June 30, 1976.[27] This contention that West Penn is not in violation of the plan thus poses no challenge to "the Administrator's action in approving or promulgating any implementation plan," 42 U.S.C. § 1857h–5(b)(1); rather, it relies on the validity of the plan provisions for granting variances. We therefore agree with West Penn that this particular contention could not have been raised in a § 1857h–5(b)(1) proceeding. It follows that the district court erred in finding that subsection (b)(2) barred its jurisdiction to decide this claim.

■■■ It also appears that subsection (b)(2) would not foreclose the district court from deciding whether a tall stack was a proper method of complying with the plan. The plan prescribes certain air quality standards which must be met, not specific methods of attaining those standards. A subsection (b)(1) suit would challenge only the plan—that is, the standards, and not the methods of compliance. Thus, subsection (b)(2) would not prevent West Penn from raising the tall stack issue in the district court.[28] See, generally, *Note: Reviewability of Administrative Action: The Elusive Search for a Pragmatic Standard*, 1974 Duke L.J. 382, 384; L. Jaffe, *Judicial Control of Administrative Action*, 353–63, 372–76 (1965). However, unless there was an affirmative grant of jurisdiction in the district court, the dismissal for lack of jurisdiction was still proper.

## II. JURISDICTION UNDER THE ADMINISTRATIVE PROCEDURE ACT AND THE DECLARATORY JUDGMENT ACT

The district court relied on this court's decision in *Getty Oil Co. v. Ruckelshaus*, 467 F.2d 349 (3d Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973), for the proposition that neither the DJA, 28 U.S.C. §§ 2201 and 2202, nor the APA, 5 U.S.C. § 701 *et seq.*, could "afford a basis for jurisdiction." 467 F.2d at 356. See also *PBW Stock Exchange, Inc. v. SEC*, 485 F.2d 718 (3d Cir. 1973); *Zimmerman v. United States*, 422 F.2d 326 (3d Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 (1970). The plaintiff in *Getty* had filed suit in the Delaware district court, attacking certain regulations which had been approved by the EPA Administrator as part of that state's implementation plan under the Clean Air Act. The district court determined that

---

**27.** We note that this argument is not legally sustainable. A variance is not effective until it is approved by the EPA Administrator. 42 U.S.C. § 1857c–5(a)(3). Such approval is lacking in this case. See note 10, *supra*. Moreover, even if the argument were valid, West Penn would be subject to citation for violating the particulate emission standards at any time after November 1, 1973. See note 8.

**28.** This case is thus different from *Getty Oil Co. v. Ruckelshaus*, 467 F.2d 349 (3d Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973), where the plaintiff challenged the Delaware plan regulations themselves. Id. at 355. See Part II, *infra*.

jurisdiction was properly invoked under 28 U.S.C. § 1337, the DJA, and the APA. On appeal, this court rejected the jurisdictional claim, finding that neither the DJA nor the APA extended federal court jurisdiction "to cases not otherwise within their competence." 467 F.2d at 356.

West Penn asserts that the district court's holding and, presumably, *Getty* are inconsistent with the Supreme Court's opinion in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). *Abbott Laboratories,* appellant contends, clearly mandates district court jurisdiction under the APA to review the administrative action contested by West Penn's complaint. The above cited cases (for example, *Zimmerman, supra* ) show that the APA does not constitute a jurisdiction grant[29] and hence we must affirm the district court's dismissal in this case. However, assuming, *arguendo,* that it did constitute such a jurisdictional grant, we would still be required to affirm such dismissal.

The APA provides, in certain instances, for judicial review of agency action. 5 U.S.C. § 701(b)(1) defines "agency" as "each authority of the Government of the United States . . . ." The APA does not extend to state agencies. Thus, it could not afford the district court jurisdiction of West Penn's suit against Goddard, who is the Secretary of a Pennsylvania agency.

As to Train, the complaint set forth two requests for relief. First, it asks that the court render a declaratory judgment that West Penn was not violating the plan as a means of preventing Train from citing the utility for acting contrary to the plan. Second, it asked an injunction against enforcement of any notice of violation. According to 42 U.S.C. § 1857c–8(a)(1), the "administrator shall notify" any "person in violation of the plan. . . ." Issuance of a violation notice is thus non-discretionary. However, the decision to enforce a violation notice is discretionary under 42 U.S.C. § 1857c–8(b).[30] The APA does not provide for review of any act "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). See *Commonwealth of Ky. ex rel. Hancock v. Ruckelshaus,* 497 F.2d 1172, 1177 (6th Cir. 1974). Thus the APA would not provide jurisdiction for the district court to issue the requested injunction. Jurisdiction to issue the requested declaratory judgment is similarly wanting under 5 U.S.C. § 704, which subjects to judicial review only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . ." West Penn cites, and we have found, no statute which makes reviewable Train's issuance of a notice of violation. Under the statutory plan, the notice of violation is not "final agency action" since it may be followed by either (1) an order which "may" be issued 30 days after the notice, 42 U.S.C. § 1857c–8(a)(1), but "shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation," 42 U.S.C. § 1857c–8(a)(4), or (2) a civil suit under 42 U.S.C. § 1857c–

**29.** *Getty* took *Abbott Laboratories* into account in deciding that the APA did not empower the district court to hear Getty's complaint. Since West Penn does not appear to have advanced any arguments that would not have been considered by the *Getty* court, we would, under normal principles of *stare decisis,* be reluctant to disregard a decision of our court which is closely analogous to the case before us. This reluctance is reinforced by the Supreme Court's favorable citation of *Getty* in *Train v. NRDC,* 421 U.S. 60, 91–92, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). We recognize, however, that some commentators have taken a more expansive view of the reviewability of administrative action under the APA than this court did in *Getty. See, e. g.,* G. Vining, *Direct Review and the Doctrine of Ripeness in Administrative Law,* 69 Mich.L. Rev. 1443 (1971); L. Jaffe, *supra,* at 339–63, 372–76.

**30.** "(b) The Administrator may commence a civil action for appropriate relief, including a permanent or temporary injunction, whenever any person—

"(1) violates or fails or refuses to comply with any order issued under subsection (a) of this section; . . . ."

8(b), referred to above. The statutory scheme contemplates that the violation notice itself has neither an independent coercive effect nor "the force of law." *Columbia Broadcasting System v. United States,* 316 U.S. 407, 418, 62 S.Ct. 1194, 86 L.Ed. 1653 (1942). The notice bears no resemblance to the Food and Drug Administration regulations which were found reviewable in *Abbott Laboratories* and *Gardner v. Toilet Goods Association,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). The Court characterized the regulations challenged in *Abbott* and *Toilet Goods* as "formal," "definitive," "effective upon publication" and "self-executing." 387 U.S. at 151, 171, 87 S.Ct. 1507. See also *Toilet Goods Association v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). By contrast, the only effect of a notice of violation is to make the recipient aware that the "definitive" regulations are not being met and to trigger the statutory mechanism for informal accommodation which precedes any formal enforcement measures. Of course, the plan's emission standards themselves *are* analogous to the regulations reviewed in *Abbott Laboratories,* but those regulations are not challenged on this appeal. See Part I above.

For the foregoing reasons, we hold that the APA provides no ground for district court review of the issues raised in West Penn's complaint.

## III. JURISDICTION AND THE DUE PROCESS CLAUSE

West Penn avers that "[i]n dismissing the instant suit for lack of jurisdiction and denying a hearing on the merits of all the issues raised in the Amended Complaint, the learned District Court has interpreted the Clean Air Act and its [sic] decision in *Getty Oil* in a manner which deprives West Penn of its due process right to a hearing guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution." Brief for Plaintiff-Appellant at 23.

■ West Penn is not claiming that it *has* been denied due process by any action of the defendants. It argues, rather, that it will not receive constitutional due process elsewhere than in a federal court hearing held prior to any other proceedings which are available to resolve the differences between the utility and the defendants. Yet at least two avenues of relief are open to West Penn, besides the present suit.

West Penn has taken the initiative in pursuing one of these alternatives by appealing to the Pennsylvania DER Environmental Hearing Board. Since the Board's decision is appealable to the Pennsylvania courts, 71 Purdon's Pa. Stats. § 1710.41, West Penn has taken the first step to state court settlement of its dispute with Goddard.[31]

Consistent with Article VI of the Constitution, providing, *inter alia,* that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, . . . ." the Supreme Court of the United States has operated under the assumption that the state judges who have sworn to uphold such Constitution will afford due process of law to the litigants before them. See *Huffman v. Pursue, Ltd.,*

---

**31.** See note 11, *supra.* West Penn will receive an adjudicative hearing before the Board. The rules of procedure at the hearing, set forth in the Pennsylvania Administrative Agency Law, 71 Purdon's Pa.Stats. § 1710.1 *et seq.,* comply with due process requirements as set forth in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

West Penn cites this court's decision in *Duquesne Light Co. v. EPA,* 481 F.2d 1, 9 (3d Cir. 1973), for the proposition that it would not be accorded due process if it were relegated to its remedies under Pennsylvania law. This asser-

tion is rejected. In *Duquesne,* the parties had already received a hearing before the Board which the court determined, from an examination of the record, was inadequate. The decision in *Duquesne* in no way implies that such a hearing is per se inadequate. We also note that West Penn errs in stating it is in the same position as the parties in *Duquesne.* Those parties were in the Circuit Court by virtue of having brought a § 1857h–5(b)(1) suit. 481 F.2d at 5. West Penn did not bring this suit under that section of the Clean Air Act.

420 U.S. 592, 610–612, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *cf. Johnson v. Mississippi,* 421 U.S. 213, 219, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975).[32] Also, in view of the strong state interest in maintaining the public health through abatement of air pollution, see 42 U.S.C. § 1857c–4(b)(1) and (2), and the broad discretion delegable to public officials in the application and enforcement of health laws, *cf. Zucht v. King,* 260 U.S. 174, 43 S.Ct. 24, 67 L.Ed. 194 (1922), we see no justification for federal court interference with the state court remedies available to the parties in this case. *Duke v. Texas,* 477 F.2d 244 (5th Cir. 1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974).

The second route to relief is opened by 42 U.S.C. § 1857c–8(a)(4), see Part II above. At the time West Penn brought this action, it had received only a notice of violation from Train. After receiving the notice, West Penn had the opportunity both for informally negotiating its differences with Train[33] and for presenting its cause to a federal district court, should EPA take formal steps to enforce the regulations allegedly violated by West Penn.[34] Thus West Penn has fu-

ture relief available to it in both the state and federal courts. Also, West Penn has not advanced any reason that due process requires one federal court suit—initiated by West Penn—but prohibits another federal court suit that might later be initiated by EPA. It is difficult to postulate in advance that two federal court proceedings which are governed by the same rules of procedure would have different results in terms of due process. See also *Getty, supra,* at 357; 42 U.S.C. § 1857h–5(c).

West Penn's argument thus appears to misapprehend the nature of due process. Due process requires, essentially, only a full and fair hearing before an impartial tribunal "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). A hearing which comports with due process[35] must ordinarily be accorded before a party can be "condemned to suffer grievous loss," *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). See *Gold-*

---

**32.** In *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 606, 95 S.Ct. 1200, 1209, the Court used this language:

"Even assuming, *arguendo,* that litigants are entitled to a federal forum for the resolution of all federal issues, that entitlement is most appropriately asserted by a state litigant when he seeks to *relitigate* a federal issue adversely determined in *completed* state court proceedings. We do not understand why the federal forum must be available prior to completion of the state proceedings in which the federal issue arises, and the considerations canvassed in *Younger [v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)] militate against such a result." (Footnote omitted.)

**33.** The utility has availed itself of this opportunity. West Penn and the EPA conferred on several occasions during the pendency of the suit. After these conferences, EPA issued an administrative order requiring West Penn to adopt and implement a procedure for complying with the Pennsylvania emission standards. EPA gave West Penn the choice of switching to low sulfur oil or to install a scrubber by

December 31, 1978. The original March 1, 1975, deadline for submission of a compliance plan was extended to May 1, 1975. Each of the final deadlines for reducing West Penn's emissions to meet the Pennsylvania standards was similarly extended for 60 days.

**34.** In *Getty,* the court noted that the plaintiff there would "be foreclosed from raising these objections in a civil and criminal proceeding for enforcement" because it had not pursued its exclusive remedy under § 1857h–5(b)(1). Since we have determined that West Penn's claims could not have been raised in a subsection (b)(1) proceeding, we conclude that West Penn is free to argue them in an enforcement proceeding.

**35.** It is axiomatic that due process is protean, its actual form at any time being a function of the rights and interests at stake in a given proceeding. *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 610, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). Thus we make no attempt to give a detailed description of a hearing which provides procedural due process.

*berg, supra; Mattern v. Weinberger,* 519 F.2d 150 (3d Cir. 1975). But see *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The hearing, however, need not be in federal court. See *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *In-Cho Chung v. Park et al.,* 514 F.2d 382 (3d Cir. 1975). Thus a party is not deprived of due process who, having no federal cause of action, is relegated to the state courts for redress. See, e. g., *Murdock v. City of Memphis,* 87 U.S. (20 Wall.) 590, 632, 22 L.Ed. 429 (1875); *Huffman v. Pursue, Ltd., supra.* Nor is a party deprived of due process merely because it must seek administrative resolution of its claims before it has access to the courts. *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *Estep v. United States,* 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); *Barnes v. Chatterton et al.,* 515 F.2d 916 (3d Cir. 1975); *Getty, supra* at 356 ff. See also *Jaffe, supra* at 381–89.[36] Further, since West Penn has not adduced, and we have not discovered, any other statutory basis than the APA for district court jurisdiction of this suit, this due process argument also appears to misunderstand the power of the federal courts.

In *Sheldon v. Sill,* 49 U.S. (8 How.) 441, 448–49, 12 L.Ed. 1147 (1850), the Court described the jurisdiction of the federal courts as being limited, first by the constitutional definition of federal court powers and, second, by the congressional distribution of jurisdiction:[37]

"It has been alleged that this restriction of the Judiciary Act, with regard to assignees of choses in action, is in conflict with this provision of the Constitution, and therefore void.

"It must be admitted, that if the Constitution had ordained and established the inferior courts, and distributed to them their respective powers, they could not be restricted or divested by Congress. But as it has made no such distribution, one of two consequences must result,—either that each inferior court created by Congress must exercise all the judicial powers not given to the Supreme Court, or that Congress, having the power to establish the courts, must define their respective jurisdictions. The first of these inferences has never been asserted, and could not be defended with any show of reason, and if not, the latter would seem to follow as a necessary consequence. And it would seem to follow, also, that, having a right to prescribe, Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies. Courts created by statute can have no jurisdiction but such as the statute confers. No one of them can assert a just claim to jurisdiction exclusively conferred on another, or withheld from all.

"The Constitution has defined the limits of the judicial power of the United States, but has not prescribed how much of it shall be exercised by the Circuit Court; consequently, the statute which does prescribe the limits

---

**36.** Were the rule otherwise, no court could require a party to exhaust administrative remedies before suing in a judicial forum. Yet the doctrine of exhaustion is widely accepted. See, e. g., *Barnes, supra; Jaffe, supra* at 424 ff.; 3 K. Davis, Administrative Law, §§ 20.01 *et seq.* (1958 ed. and 1970 Supp.). Also, the Supreme Court has stated on several occasions that delegation of the power to entrust enforcement of statutory rights to an administrative process is not a violation of the constitutional right to a jury trial under the Seventh Amendment. See *Pernell v. Southall Realty,* 416 U.S. 363, 383, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974), and cases there cited.

**37.** The concept of federal courts as exercising only limited, as opposed to general, jurisdiction was hardly original with *Sheldon.* See, e. g., *Marbury v. Madison,* 5 U.S. (1 Cranch.) 137, 2 L.Ed. 60 (1803). Just how limited federal jurisdiction actually is has been the subject of active debate. See generally, P. Bator, P. Mishkin, D. Shapiro, and H. Wechsler, Hart and Wechsler's, The Federal Court and the Federal System, 314–24; 330–75 (1973).

of their jurisdiction, cannot be in conflict with the Constitution, unless it confers powers not enumerated therein.

"Such has been the doctrine held by this court since its first establishment. To enumerate all the cases in which it has been either directly advanced or tacitly assumed would be tedious and unnecessary."

The holding of *Sheldon,* reaffirmed countless times, requires a statutory basis for district court jurisdiction of West Penn's action. The mere invocation of "due process" cannot without more furnish such a basis in this suit.

Finally, even if we did discover a statutory grant of jurisdiction, the inapplicability of the APA would pose immunity barriers to this suit against Train, while the policy against federal court intervention in the state administrative process would prevent suit against Goddard. *Beale v. Blount,* 461 F.2d 1133, 1138 (5th Cir. 1972). See *Huffman, supra* at 421 U.S. at 605–607, 95 S.Ct. 1200; *Jaffe, supra* at 213–31, 327–29.

For the foregoing reasons, the June 19, 1974, district court order will be affirmed.[38] Costs will be taxed against appellant.

ADAMS, Circuit Judge (dissenting).

I respectfully dissent from the majority's decision because I believe that a no-

tice by the federal Environmental Protection Agency that a firm is violating a federally approved air pollution regulation is, under the specific factual configuration here, judicially reviewable under the Administrative Procedure Act (APA).[1]

Pursuant to the Clean Air Act Amendments of 1970[2] the Administrator of the Environmental Protection Agency issued a national primary ambient air quality standard regulating the permissible concentration of sulfur oxides.[3] Under the Act, each state is required to develop and submit for approval by the Administrator an implementation plan, designed to achieve the Administrator's air quality standards.[4] Once a state's plan has been ratified by the EPA, it becomes enforceable as a federal regulation.

After the Administrator approved the Pennsylvania plan, which included a provision intended to achieve compliance with the Administrator's limitation on the proportion of sulfur oxides in the ambient air, West Penn did not exercise its right to challenge the EPA's approval in the federal courts.[5] West Penn did, however, in accordance with the terms of the Pennsylvania plan, petition the Pennsylvania Department of Environmental Resources (DER) for a variance from the plan's sulfur oxide emission[6] restriction as it applied to the company's Boiler No. 33 at its Mitchell Power Station.

---

**38.** We are not precluded from affirming the district court's order, even though we disagree with that court's determination that jurisdiction was lacking because 42 U.S.C. § 1857h–5(b)(1) provided West Penn's exclusive remedy. *Rhoads v. Ford Motor Co.,* 514 F.2d 931, at 934 (3d Cir. 1975); *Tunnell v. Wiley,* 514 F.2d 971, at n. 4 (3d Cir. 1975); *Litwicki v. Pittsburgh Plate Glass Industries, Inc.,* 505 F.2d 189, 192 n. 4 (3d Cir. 1974).

**1.** 5 U.S.C. § 701 et seq. (1967).

**2.** Pub.L. 91–604, 84 Stat. 1676.

**3.** Under 42 U.S.C. § 1857c–4, the Administrator is directed to fix national primary and secondary ambient air quality standards for air pollutants detracting from the public health or welfare. *See* 42 U.S.C. § 1857c–3.

Primary ambient air quality standards are those necessary, in the Administrator's judg-

ment, to protect national health. Secondary ambient air quality standards are those necessary, in the Administrator's judgment, to preserve the general welfare. *See* 42 U.S.C. § 1857c–4(b).

**4.** 42 U.S.C. § 1857c–5.

**5.** 42 U.S.C. § 1857h–5(b)(1) permits a party aggrieved by the Administrator's approval of any implementation plan to seek review in the court of appeals for the appropriate circuit within 30 days of the Administrator's action.

**6.** Although West Penn Power sought variances from several of the plan's emission limitations, only the sulfur oxide restriction is relevant to this appeal.

On September 13, 1973, before DER had acted on West Penn's request for a variance, West Penn received from EPA a notice that Boiler No. 33 was in violation of the federally approved Pennsylvania implementation plan. Subsequently, on September 19, 1973, DER granted West Penn a temporary variance from the sulfur oxide emission restriction, conditioned upon West Penn's proceeding with the installation of a flue gas desulfurization device, referred to as a "scrubber." The EPA has not approved this variance from the Pennsylvania plan.[7] West Penn, dissatisfied with the state's conditioning the variance upon the installation of a scrubber, appealed the DER's order to the Pennsylvania Environmental Hearing Board.[8]

West Penn then sued[9] the Administrator of the EPA, the DER, and the Secretary of the DER. The company requested a declaratory judgment that West Penn was not in violation of the Pennsylvania implementation plan and that the defendants had no right to reject West Penn's proposal for achieving compliance by use of a tall stack.[10] The firm also asked for preliminary and perma-

nent injunctions barring the Administrator from proceeding to enforce the September 13, 1973 notice of violation and preventing DER and its Secretary from enforcing their order, in response to West Penn's variance application, directing the utility to install a scrubber.

Motions to dismiss with respect to all the defendants were granted by the district court. The trial judge concluded that the action against DER was barred by the Eleventh Amendment. As to the Secretary of DER, the court held that, although the Eleventh Amendment did not prohibit the suit, the district court had no jurisdiction because insofar as the suit was a challenge to the Pennsylvania implementation plan, it was barred by 42 U.S.C. § 1857h–5(b)(2).[11] In any event, the trial judge held that he had no authority to interfere with the exercise of discretion by the Secretary of DER in issuing variances for EPA approval.[12] As detailed more fully in the majority opinion, the district court, relying in large measure on 42 U.S.C. § 1857h–5(b)(2) and *Getty Oil*,[13] also rejected all the proffered bases for its jurisdiction to hear the suit against the Administrator of the EPA.

7. A variance from an EPA accepted state implementation plan must be approved by the EPA before the polluter is sheltered from federal enforcement of the emission limitations contained in the implementation plan. 42 U.S.C. §§ 1857c–8; 1857c–5(d); 1857c–5(a)(3). For a discussion of the procedure for obtaining EPA approval of such a variance, see *Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). West Penn did not ask the district court to compel the Administrator to approve the variance, and we need not therefore decide whether such a remedy would be available to the company.

8. *See* 35 Pa.Stat.Ann. §§ 4004(4.1), 4013.5 and 71 Pa.Stat.Ann. § 1710.41.

9. West Penn's original complaint did not name the Secretary as a defendant.

10. The primary and secondary ambient air quality standards issued by the Administrator define maximum permissible concentrations of sulfur oxides in the atmosphere. A scrubber is intended to achieve these standards by removing the pollutants from exhaust gases before they are discharged. In contrast, tall stacks are designed to reduce the atmospheric

concentrations by dispersing the compounds over a wider area.

11. 42 U.S.C. § 1857h–5 provides, in relevant part:

(b)(1) . . . A petition for review of the Administrator's action in approving . . . any implementation plan under section 1857c–5 of this title . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such . . . approval . . ., or after such date if such petition is based solely on grounds arising after such 30th day.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.

12. West Penn did not appeal the dismissal of DER. The majority affirms the dismissal as to the Secretary.

13. *Getty Oil Co. v. Ruckelshaus*, 467 F.2d 349 (3d Cir. 1972), *cert. denied* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).

As the majority discerns, one of the arguments pressed by West Penn is that, aside from any variance, a tall stack strategy is a permissible method of complying with the implementation plan, and therefore West Penn is not contravening the plan. However, the majority states that such a contention does not constitute a justiciable issue between West Penn and the Administrator under the APA, first, because the issuance of a notice of violation by the EPA is not "final agency action," and second, because the Administrator is invested with substantial discretion in determining whether compliance procedures should be initiated. I disagree.[14]

The APA is to be liberally construed in favor of affording judicial review of administrative actions. In the words of Justice Harlan in the landmark case of *Abbott Laboratories v. Gardner,* the " 'generous review provisions' [of the APA] must be given a 'hospitable' interpretation." [15] Judicial supervision of agency conduct is not precluded "unless there is persuasive reason to believe that such was the purpose of Congress." [16] The APA "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.' " [17] As this Court recently declared, albeit in the context of a case in which we found an express Congressional prohibition against judicial review of the agency action in question:

> Federal agencies should not be able to retreat behind the concept of no judicial review unless Congress has specifically authorized such a ban.[18]

## SECTION 1857h–5(b)(2) DOES NOT BAR WEST PENN'S SUIT

As the majority states, this Court's interpretation in *Getty Oil* of 42 U.S.C. § 1857h–5(b)(2) does not impede West Penn's attempt to have the trial court decide whether the company has fulfilled its responsibilities under the Pennsylvania plan. Instead of seeking judicial review of the EPA's approbation of the Delaware implementation plan, Getty asked the state for a variance delaying the effective date of the plan's restriction on the sulfur content of fuels burned in a particular region of the state. The state administrative agencies denied the variance, but the state courts temporarily restrained Delaware from enforcing the restriction. While the state was so restrained, however, the EPA demanded compliance. Getty asked this Court to set aside EPA's order on the grounds that primary air quality standards had already been reached and that compliance, prior to the development of alternative technology, would impose an unreasonable economic burden. The panel held that we could not in the procedural posture of that case entertain economic or technological objections to the plan.

*Getty* interpreted section 1857h–5(b)(2) to foreclose later judicial inquiry with respect to issues which could have been raised before a court of appeals in a suit challenging federal approval of a state implementation plan within 30 days after such approval. West Penn's contention that it has acted in conformity with the plan, however, unlike Getty's argument, does not take exception to the validity of the plan. At least with respect to this issue, West Penn in essence con-

---

**14.** Of course, I express no opinion on the merits of West Penn's claim that tall stacks are sufficient, an issue which was not addressed by the district court and which the parties have not briefed or argued here.

**15.** 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

**16.** *Id.* See *Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955); *Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962).

**17.** 387 U.S. at 140, 87 S.Ct. at 1511.

**18.** *Pollard v. Romney,* 512 F.2d 295, 298 (3d Cir. 1975).

cedes the legitimacy of the Pennsylvania plan and asserts that the company has obeyed it. This issue could not have been raised in a suit contesting EPA's approval of the plan. Thus section 1857h–5(b)(2) does not furnish "clear and convincing evidence," or indeed any evidence, that Congress intended to prevent judicial review of the question whether West Penn may comply with the Pennsylvania plan by constructing a tall stack.

## THE SEPTEMBER 13, 1973 NOTICE OF VIOLATION ISSUED BY EPA REPRESENTS FINAL AGENCY ACTION

In order to assess whether the notice of violation constitutes "final" agency action "committed to agency discretion by law" within the meaning of the APA [19]—a characterization of the EPA's role made by the majority in sustaining the district court—it is necessary to outline the statutory enforcement procedures under the Clean Air Act. Whenever the EPA learns that any person is in violation of a federally-sanctioned implementation plan, the Administrator "shall notify the person in violation of the plan and the State in which the plan applies of such finding." [20] If the failure to conform to the plan continues beyond 30 days from the date of the notice of violation, the Administrator may commence a civil enforcement action in the district court or "may issue an order requiring such person to comply" with the plan.[21] Any such order "shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation.[22] Whether or not any enforcement suit has been filed or any compliance order issued, however,

> [a]ny person who knowingly violates any requirement of an applicable implementation plan . . . more than 30 days after having been notified by the Administrator . . . shall be punished by a fine of not more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both." [23]

The penalties for failure to obey a compliance order are the same as those for failure to abate pollution within 30 days of a notice of violation.[24] If a conviction under this section is not the offender's first, the penalties are doubled.[25]

Determination of the "finality" of agency action under the APA must be viewed pragmatically. In *Frozen Food Express v. United States,* for example, the ICC had issued an order stating that specified goods did not qualify for the "agricultural commodities" exemption from the statutory requirement that motor carriers possess a permit or certificate. The Supreme Court ruled that this was a final order. Although the decree under attack did not directly command the plaintiff carrier to do or not to do any particular act, the Court considered the order final and justiciable because it had "an immediate and practical impact" on motor carriers and shippers:

> The determination made by the Commission is not therefore abstract, theoretical, or academic. . . . The "order" of the Commission which classifies commodities as exempt or nonexempt is, indeed, the basis for carriers in ordering and arranging their affairs. . . . Carriers who are

---

**19.** 5 U.S.C. § 701(a) provides in pertinent part:
This chapter applies, according to the provisions thereof, except to the extent that—
(1) statutes preclude judicial review . .

(2) agency action is committed to agency discretion by law.
5 U.S.C.A. § 704 provides in part:
[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review.

**20.** 42 U.S.C. § 1857c–8(a)(1).

**21.** *Id.*

**22.** 42 U.S.C. § 1857c–8(a)(4).

**23.** 42 U.S.C. § 1857c–8(c)(1).

**24.** *Id.*

**25.** *Id.*

without the appropriate certificate or permit, because they believe they carry exempt commodities, run civil and criminal risks.[26]

As I have previously observed, the triad of Supreme Court decisions in *Frozen Food, Storer Broadcasting*[27] and *CBS* has an overarching importance which reaches beyond the particular facts involved in those cases. In view of the continuing significance afforded to those decisions by the courts, the principles adopted in them constitute a "rule" of federal administrative law which favors review where the impact of agency action is, as in this case, concrete and immediate.[28]

Here, further proceedings within the agency are not necessary before the Administrator's decision is enforceable against West Penn.[29] The notice of violation, independent of any further proceedings thus has a coercive effect upon the utility. Continuation of West Penn's present compliance strategy beyond 30 days from the date of the notice would render the company subject to the possibility of a $25,000 fine for each day of continued violation and would impose on the corporate officers the risk of imprisonment if the EPA's interpretation of the implementation plan is eventually adjudicated correct.

On the other hand, compliance with the plan as construed by the Administrator would require the immediate commencement of the installation of a multi-million dollar scrubber device[30] or the prompt shutdown of the power plant. The choice faced by West Penn is analogous to that of the drug companies in *Abbott Laboratories*; if the drug manufacturers wished to conform to the agency's labeling requirements,

> [T]hey must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance . . . would risk serious criminal and civil penalties . . . .[31]

Thus the notice of violation here, like the regulation in *Abbott,* is final agency action because it impels the company to accede to the dictates of the Administrator.[32]

Also, the notice of violation here is reviewable as final action because judicial resolution of the question whether West Penn's proposed mode of pollution control is interdicted by the state plan would not unduly disrupt the systematic processing of the case within the EPA.

> [T]he relevant considerations in determining finality are whether the process of administrative decision-making has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined.[33]

---

**26.** 351 U.S. 40, 43–44, 76 S.Ct. 569, 571, 100 L.Ed. 910 (1956). *See United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *Abbott Laboratories,* 387 U.S. at 149–51, 87 S.Ct. 1507.

**27.** *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

**28.** *PBW Stock Exchange v. Securities and Exchange Comm'n,* 485 F.2d 718, 741 (3d Cir. 1973) (dissenting opinion), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1993, 40 L.Ed.2d 558 (1974).

**29.** See 42 U.S.C. § 1857c–8(c)(1).

**30.** West Penn represented to the district court that installation of a scrubber at the plant in question would require an expenditure in excess of $23 million and that operation of the equipment would increase operating costs by $6.5 million annually. The Administrator has not disputed the order of magnitude of these figures.

**31.** 387 U.S. at 151–53, 87 S.Ct. at 1517.

**32.** *See also National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689, 698 (1971).

**33.** *Port of Boston Marine Terminal Assoc. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 70–71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

The notice that West Penn has failed to adapt to the Pennsylvania plan represents the Administrator's definitive interpretation of the plan. His conclusion was not merely tentative. Nor did the company's complaint present to the district court an abstract question or a hypothetical situation. No further administrative proceedings were necessary before a suit could be commenced by the EPA compelling compliance with the plan and extracting the statutory penalty. Although the Administrator may decide when enforcement measures should be taken and whether the agency should issue a compliance order [34] or go directly to the district court, those determinations ordinarily will not include a re-interpretation by the Administrator of the implementation plan. Thus there were no on-going administrative functions which could be disrupted by the judicial review requested by West Penn.

## REVIEW SHOULD NOT BE DENIED HERE BECAUSE OF THE POSSIBILITY OF ENFORCEMENT PROCEEDINGS IN THE FUTURE

As discussed earlier, since the issue of its compliance with the plan could not have been adjudicated in an action taking exception to federal approval of the plan, West Penn would be free to assert in any litigation brought to compel obedience to the plan or to a compliance order—as well as in any suit to impose a penalty—that it has already conformed to the plan by installing a tall stack. The possibility of a subsequent enforcement proceeding, however, does not generally prevent review of agency action at the request of an aggrieved party where, as here, that party may reasonably be intimidated into acquiescing in the administrative ruling before he can obtain a hearing at the enforcement stage.[35]

Under the statutory scheme before us the Administrator may indefinitely delay voking the power of the district courts so as to force West Penn into what the EPA considers compliance with the plan. Yet for each day of violation beyond an initial 30 day period West Penn would possibly incur a substantial fine. Thus, because of the potential liability if its good-faith interpretation of the plan is incorrect, West Penn may not be able, as a practical matter, to defy the EPA for any prolonged period. Therefore, whether or not due process is satisfied by the enforcement action, that proceeding, the timing of which is entirely within the control of the agency, provides an inadequate forum under the APA for adjudicating the rights of the utility.

The state legislation before the Supreme Court in the historic case of Ex parte Young possessed a similar *in terrorem* effect.[36] That case, of course, arose long before the enactment of the APA and in any event involved state rather than federal administrative actions. The Court's description of the impact of the legislation, however, may be instructive here. The railroads in *Young* sought an adjudication that the rates set by the state regulatory commission were so low as to be confiscatory. State law imposed a fine of up to $5,000 as well as imprisonment for each transaction in which the rate charged exceeded the regulated rate. The Court stated, "The officers and employees could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them, in case the court should decide that the law was valid. The result would be a denial of any hearing to the company." [37]

## ENFORCEMENT OF THE PENNSYLVANIA IMPLEMENTATION PLAN IS NOT ACTION "COMMITTED TO AGENCY DISCRETION BY LAW" SO AS TO PRECLUDE JUDICIAL REVIEW

Judicial consideration of West Penn's assertion that its tall stack strategy is in

---

**34.** A compliance order was issued to West Penn on February 18, 1975, subsequent to the decision by the district court.

**35.** *See Abbott Laboratories,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; *United States v.*

*Storer Broadcasting,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

**36.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

**37.** *Id.* at 146, 28 S.Ct. at 448.

harmony with the state plan is not prohibited by the fact that Congress has left to the Administrator the tactical decisions when and by what method the EPA can most effectively execute the implementation plans. Although the APA provides an exception to the regime of judicial supervision in those cases where "agency action is committed to agency discretion by law," [38] that exception is applicable only in those discreet and infrequent situations where Congress explicitly expressed an intent that the judgment of the executive branch be wholly unfettered. The Supreme Court has explained that this is "a very narrow exception. . . . [I]t is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " [39]

Although some aspects of a given decision may be committed entirely to the policy judgment of an expert administrator, where legal standards are implicated the courts are available to persons aggrieved by the decision in order to assure that the agency has adhered to the proper standards in carrying out its duty.[40]

> An "all or nothing" approach to reviewability would, in specific cases, either be unfair to persons aggrieved by agency action, or impose an unwise burden upon the agency or the courts. Accordingly, separable issues appropriate for judicial determination are to be reviewed, though other aspects of the agency action may be committed to the agency's expertise and discretion.[41]

In the case at hand, the question whether tall stacks meet air purity requirements of the applicable implementation plan is a legal issue wholly divorc-

ed from the Administrator's exercise of discretion in concluding at what time and in what manner the plan should be enforced in order to maximize the public benefit. A resolution now by the district court of the issue raised by West Penn would be confined to an interpretation of the plan and need not in any way interfere with the proper and expeditious functioning of the EPA.

## CONCLUSION

Since the APA embodies a presumption of federal review, since the issuance of a notice of violation in this context has an immediate and grave impact on the alleged polluter, since adjudication of a claim that the alleged polluter is obeying the applicable implementation plan would not interfere with the discretionary functions entrusted to the Administrator, and since no other effective judicial review is available, I would hold that the APA furnishes a basis upon which an alleged polluter may obtain a forum for prompt resolution of his claim that he has accommodated his conduct to the implementation plan.

There is a strong public interest in the expeditious resolution of this type of dispute. If West Penn is relegated to reliance on some distant enforcement hearing, the threat of a $25,000-a-day penalty may impel the company to undergo an unnecessary expense of millions of dollars, which will have to be borne either by the firm's shareholders or, more likely, its ratepayers. On the other hand, if the Administrator's interpretation of the plan is correct, in the absence of a hearing, West Penn may in good faith continue to imperil the public health and welfare by exceeding the permissible

---

**38.** 5 U.S.C. § 701(a)(2).

**39.** *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

**40.** *East Oakland-Fruitvale Planning Council v. Rumsfeld,* 471 F.2d 524, 534 (9th Cir. 1972); *Scanwell Laboratories v. Shaffer,* 137 U.S.App. D.C. 371, 424 F.2d 859 (1970); *Cappadora v. Celebrezze,* 356 F.2d 1 (2d Cir. 1966).

**41.** *East Oakland-Fruitvale Planning Council,* 471 F.2d at 533. See, e. g., *Dunlop v. Bachowksi,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Campaign Clean Water, Inc. v. Train,* 489 F.2d 492, 498 (4th Cir. 1973); *Parker v. United States,* 448 F.2d 793, 797–98 (10th Cir. 1971); *Reddy, Inc. v. Dept. of Labor,* 492 F.2d 538, 544 (5th Cir. 1974).

concentration of pollutants. Accordingly, I would remand the cause to the district court for consideration whether the proposed tall stack fulfills the requirements of the plan.[42]

---

**42.** Since the majority reaches the merits of the applicability of the APA to this dispute, I assume, without deciding, that if the APA is not itself jurisdictional in nature, *Zimmerman v. United States*, 422 F.2d 326, 330–31 (3d Cir. 1970), jurisdiction would be under one of the general grants of jurisdiction, such as 28 U.S.C. § 1337. *See Dunlop v. Bachowski*, 421 U.S. 560, 566, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Davis v. Romney*, 490 F.2d 1360 (3d Cir. 1974). Although the district court rejected § 1337 as a basis for jurisdiction, it did so apparently in reliance on section 1857h–5(b)(2). The majority's statement, at fn. 26, that West Penn does not appeal that ruling by the trial judge appears to take an unnecessarily restrictive view of West Penn's contentions.